[No. S062139. June 22, 2000.]

KRANSCO, Plaintiff and Appellant;
INTERNATIONAL INSURANCE COMPANY et al., Plaintiffs and
Respondents, v.
AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY,
Defendant and Appellant.

## COUNSEL

Thacher, Albrecht & Ratcliff, James F. Thacher, Arthur R. Albrecht, Frank E. Solomon; Quarles & Brady, W. Stuart Parsons, Kevin P. Crooks, Katherine H. Grebe; Irell & Manella and Thomas W. Johnson, Jr., for Plaintiff and Appellant.

Anderson Kill & Olick, Jordan S. Stanzler, Deborah M. Mongan and John A. MacDonald for United Policyholders as Amicus Curiae on behalf of Plaintiff and Appellant.

James T. Linford as Amicus Curiae on behalf of Plaintiff and Appellant.

Latham & Watkins, David L. Mulliken, Kristine L. Wilkes, Dorn G. Bishop and Julia E. Parry for Montrose Chemical Corporation of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Carroll, Burdick & McDonough, Bertrand LeBlanc II, Donald T. Ramsey, David M. Rice, Rosemary Springer; Kravit Gass & Weber, J. Ric Gass, Janice A. Rhodes, Caren B. Goldberg; Newman & Company and Thomas R. Newman for Defendant and Appellant.

Hancock Rothert & Bunshoft, Richard L. Seabolt, Eve F. Lynch and Robert M. Fineman for London Market Insurers as Amicus Curiae on behalf of Defendant and Appellant.

Horvitz & Levy, Lisa Perrochet and Stephanie Rae Williams for Truck Insurance Exchange and Allstate Insurance Company as Amici Curiae on behalf of Defendant and Appellant.

Engstrom, Lipscomb & Lack, Bolson, Nishimura & Saunders, Hahn Bolson & Mendelson, Jeffrey T. Bolson and Karen-Denise Lee for Plaintiffs and Respondents International Insurance Company and Transco Syndicate No. 1, Ltd.

Gibbons, Lees & Conley, Gibbons & Conley and Dolores M. Donohoe for Plaintiff and Respondent Agricultural Excess and Surplus Insurance Company.

## OPINION

**BAXTER, J.**—Can a liability insurer assert the insured's "comparative bad faith" as an affirmative defense in a bad faith action brought against it for

breach of the covenant of good faith and fair dealing? In this case a liability insurer breached its duty of good faith and fair dealing owed its insured manufacturer by unreasonably failing to settle an injured third party's action against the insured within policy limits, thereby exposing the insured to a verdict awarding the injured party compensatory and punitive damages far in excess of policy limits. On appeal the insurer did not contest the jury's finding of bad faith, but argued the insured's comparative bad faith and comparative negligence as a litigant in the underlying third party action was a contributing legal cause of the verdict and should reduce its liability for tort damages in the bad faith action.

The trial court initially accepted this argument, instructing the jury to determine if the insured itself breached its reciprocal duty of good faith and fair dealing toward the insurer or acted negligently in failing to exercise ordinary care as a litigant in the underlying third party action. The jury found the insured's conduct did contribute to the amount of the verdict in excess of policy limits and set the insured's comparative fault at 90 percent. The trial court thereafter decided it had erred in instructing the jury on comparative bad faith and comparative negligence and entered judgment notwithstanding the verdict in favor of the insured for the full amount of the insured's damages, without reduction for the insured's comparative fault as allocated by the jury. (Code Civ. Proc., § 629.)

Both the insurer and insured appealed on a number of grounds. As relevant here, the insurer sought reinstatement of the jury's verdict allocating fault and liability for damages. The Court of Appeal affirmed the judgment in its entirety. For reasons to be explained, we conclude a liability insurer cannot assert the comparative bad faith of its insured in the underlying third party litigation as an affirmative defense in a bad faith action brought against it.

## I. FACTS

### A. *The Wisconsin Products Liability Litigation*

In June 1987, 35-year-old Michael Hubert jumped headfirst onto his Wisconsin neighbor's backyard water slide toy known as a Slip 'N Slide and broke his neck, rendering him a partial quadriplegic.[1] Hubert brought a personal injury action in Wisconsin against Kransco, the California corporation that manufactured the Slip 'N Slide toy (the *Hubert* action).

---

[1] Hubert is six feet three inches tall and weighed 220 pounds at the time. The Slip 'N Slide is basically a piece of plastic that lies flat on the ground and becomes slippery when made wet. It was "not intended for adult use" and contains explicit warnings against adult usage as

Kransco tendered defense of the action to its Ohio-based primary liability carrier, American Empire Surplus Lines Insurance Company (AES), which had agreed to defend Kransco against personal injury actions in any state and indemnify it for all sums it became legally obligated to pay as damages up to $1 million, less Kransco's $100,000 self-insured retention. Kransco also had three layers of excess insurance above its AES primary insurance coverage: International Insurance Company (International) provided $2 million in excess of the $1 million primary coverage, Agricultural Excess and Surplus Insurance Company (Agricultural) provided the next layer of $1 million in excess of the $3 million, and Transco Syndicate No. 1 Ltd. (Transco) provided the last layer of excess insurance: $1 million in excess of the $4 million. In all, Kransco had $5 million in available liability coverage over and above its $100,000 self-insured retention.

During the discovery phase of the *Hubert* action, in response to an interrogatory by Hubert, Kransco denied knowledge of prior Slip 'N Slide accidents that had resulted in cervical injuries to adults. Kransco later amended its response to admit knowledge of two such accidents. One accident had resulted in the user's death, the other had left the user a quadriplegic and resulted in a $1.5 million settlement against the corporation from which Kransco had purchased the rights to manufacture the Slip 'N Slide. Kransco's amended response itself contained inaccurate information about the date of one of these accidents.

Hubert's action against Kransco was tried to a Wisconsin jury in April 1991. During the trial, Hubert offered to settle the action for $750,000, almost a million dollars less than his pretrial demand. Kransco approved settlement at that amount and tendered its $100,000 self-insured retention. Primary insurer AES, however, would contribute only $250,000 toward a settlement. AES rejected Hubert's $750,000 settlement offer and, given Kransco's willingness to contribute $100,000, and excess insurer International's willingness to contribute another $100,000, made a counteroffer of $450,000, which Hubert rejected. The jury ultimately returned verdicts awarding Hubert roughly $2.3 million in compensatory damages and $10 million in punitive damages.

---

well as instructions on its proper use. Hubert never saw or attempted to read the instructions on the proper use of the toy slide. He ran toward it from a point nearly 40 feet away and, when he reached it, dove into the air, coming down at a steep angle in what one witness described as "a jackknife."

In June 1991, while postverdict motions were pending in the Wisconsin trial court to reduce the unprecedented punitive damages award,[2] Kransco settled with Hubert. Kransco and its insurers paid Hubert $7.5 million. Of this amount, AES contributed its policy limits of $900,000 while objecting to the settlement as unreasonable because it thought the verdict likely would have been judicially reduced or set aside. Excess insurers International and Agricultural contributed their policy limits of $2 million and $1 million, respectively, and excess insurer Transco contributed $500,000, half its policy limit.[3] Kransco paid the remaining $3.1 million from its own funds. At Hubert's insistence, Kransco stipulated to entry of judgment against it in the full amount of the jury verdict plus interest (approximately $12.5 million) but Hubert agreed not to execute on the judgment. Additionally, under the terms of the settlement Kransco agreed to prosecute a bad faith action against AES and to split equally with Hubert any net proceeds from the litigation (after deduction of litigation expenses and reimbursement of the subrogated excess insurers' cash settlement payments).

## B. *The California Bad Faith Litigation*

Kransco initiated this bad faith action against AES in January 1992, alleging AES had breached the implied covenant of good faith and fair dealing by rejecting Hubert's offer to settle his lawsuit against Kransco for a sum within the AES policy limits despite a substantial risk of a verdict greatly in excess of those limits. Among other claims, Kransco sought recovery of $11.6 million, the amount by which the *Hubert* judgment exceeded the AES policy limits and Kransco's self-insured retention.[4] AES answered with a general denial and the assertion of various affirmative defenses. As one affirmative defense, AES alleged that Kransco had "failed to exercise ordinary care for its own safety" and that "such failure on its part proximately contributed to and was the sole proximate cause of all the loss and damage complained of by [Kransco], if any there were." AES further alleged that "any recovery by [Kransco] is barred or limited by the unreasonable conduct and comparative bad faith actions of [Kransco] and/or its

---

[2]Prior to the *Hubert* verdict, the largest punitive damage award ever returned in Wisconsin was $200,000.

[3]The Transco policy expressly excluded punitive damages, which are insurable in Wisconsin. The exclusion may explain Transco's failure to contribute its policy limits.

[4]Kransco further sought $10 million in punitive damages from AES. In September 1993, the trial court granted summary adjudication, dismissing Kransco's punitive damages claim. Kransco also claimed that damages were incurred after the *Hubert* settlement when an unrelated injury action cost over $2 million in settlement and defense, which was paid by Kransco and its excess insurer Transco because otherwise-available insurance coverage had been exhausted by the Hubert claim mishandled by AES. These consequential damages were included in the Kransco judgment and affirmed on appeal.

duly authorized agents and representatives with respect to the matters alleged in its First Amended Complaint herein."

At the trial of the bad faith action, AES argued that Kransco was itself largely at fault for the excess verdict (i.e., the large *Hubert* compensatory and punitive damages award) as a consequence of its having given false interrogatory answers during pretrial discovery in the Wisconsin products liability action. The Court of Appeal characterized the claim and relevant supporting facts as follows:

"Kransco submitted an incorrect interrogatory answer in the underlying *Hubert* action and AES contends that this act constituted breach of the covenant of good faith and fair dealing or negligence in handling the *Hubert* action. Early in the case, Hubert served an interrogatory asking Kransco if it knew of any similar injury accidents predating his own injury in 1987. Kransco replied, in July 1990, that it had no notice of any adult cervical injuries from backyard water toys before 1987. The interrogatory answer was wrong.

"A Kransco product development vice-president knew of two adult cervical injuries on the Slip 'N Slide that had occurred when the water slide was made by another toy manufacturer before Kransco acquired that manufacturer's assets and reintroduced the toy in 1983. One of those injuries resulted in quadriplegia, the other in death. Kransco's general counsel neglected to ask the product development vice-president about prior injuries before answering the interrogatory. Kransco's counsel in the *Hubert* action learned of the vice-president's knowledge of prior injuries when preparing him for his December 1990 deposition, and immediately informed Hubert's counsel of the error. Kransco amended its interrogatory answer several months before trial to disclose this information, although the amendment itself was inaccurate because it stated that one of the accidents occurred approximately 30 years earlier when it was really closer to 20 years earlier.

"AES was fully informed of the previous Slip 'N Slide injuries well before trial and receipt of Hubert's settlement offer, but complains that the

---

[5]The earlier accident resulting in a fatality was a matter of public record in Wisconsin, as the ensuing litigation had culminated in a reported decision. (See *Drake v. Wham-O Manufacturing Company* (E.D.Wis. 1974) 373 F.Supp. 608.) As the Court of Appeal noted, there was also evidence that Hubert and his counsel were already aware of at least one of the two prior Slip 'N Slide accidents prior to Kransco's tendering the incorrect interrogatory responses to plaintiffs.

[6]Kransco's general counsel, Stuart Schneck, who prepared and submitted the false interrogatory responses on Kransco's behalf, was not a witness in the underlying Wisconsin action.

excess verdict is attributable in substantial part to Kransco's pretrial discovery blunders which were exploited by Hubert's counsel at trial. Hubert's counsel argued to the jury that Kransco's original and amended interrogatory responses were an untruth followed by a half-truth and suggested that there may be other Slip 'N Slide accidents never disclosed. Of course, the extended argument to the jury included a great many points unrelated to Kransco's interrogatory answers, including the central claim that Kransco should never have reintroduced an injury-producing toy discontinued by its predecessor and did so without adequate warnings of danger in callous pursuit of $5 million annual gross profit. But AES maintains that the accusation of lying leveled against Kransco was explosive to a jury considering punitive damages, and invokes principles of comparative bad faith and comparative negligence to demand that Kransco's damages be reduced in proportion to its posited fault in causing the excess verdict."

The trial court instructed the jury on both of AES's comparative fault theories. Regarding comparative bad faith, the trial court instructed the jury: "I have already described the implied covenant of good faith and fair dealing that the law implies in every insurance contract. Because that implied covenant of good faith and fair dealing applies to both the insurer and the insured, Kransco had a duty to AES not to do anything that would injure AES's right to receive the benefits of their agreement. To do so would constitute bad faith on Kransco's part. [¶] Comparative bad faith does not relieve AES of its obligations or bar a recovery by Kransco against AES, but the total amount of damages to which Kransco would otherwise be entitled shall be reduced in proportion to the amount of comparative fault attributable to Kransco, Kransco's attorneys, or Kransco's agent."

Regarding comparative negligence, the trial court instructed the jury: "Comparative negligence is the failure, if any, on the part of Kransco to exercise ordinary care, which when combined with AES's breach, if any, of its obligations of good faith and fair dealing contributed to cause Kransco's injury. [¶] The negligence referred to here is not any lack of care or breach of any legal duty owed by Kransco to Michael Hubert or other Hubert plaintiffs involved in the 1991 Wisconsin trial. It is the negligence, if any, of Kransco in the preparation and trial of the *Hubert v. Kransco* case, and then only if it was a legal cause of the plaintiffs verdict in the amount returned and entered. [¶] Comparative negligence, if any, on the part of Kransco does not bar a recovery against AES, but the total amount of damages to which Kransco would otherwise be entitled shall be reduced in proportion to the amount of fault attributable to Kransco."

Upon evidence not challenged by AES on appeal, the jury returned a special verdict finding AES had breached its duty of good faith and fair

dealing toward Kransco in its handling of Hubert's personal injury claim. However, the jury also found Kransco had breached the duty of good faith and fair dealing owed to AES or had failed to exercise ordinary care for its own safety, or both, in its handling of Hubert's claim before the verdict. The jury assessed compensatory damages at over $13.6 million, apportioning fault for these damages at 90 percent to Kransco and 10 percent to AES. The jury further found Kransco did not act unreasonably in agreeing to the postverdict settlement with Hubert.

Kransco moved for judgment notwithstanding the verdict (Code Civ. Proc., § 629) or, in the alternative, for new trial (*id.*, § 657) on the ground, among others, that the trial court had erred in instructing on both theories of comparative fault: comparative bad faith and comparative negligence. The trial court reconsidered and agreed, concluding comparative negligence was wholly inapplicable to the case and that its instruction on comparative fault should have been limited to "whether Kransco contributed to AES's failure to settle by impairing its assessment of the risk of a substantial likelihood of an excess judgment." The court found the jury's verdicts finding comparative fault were unsupported by the evidence because "AES presented no substantial evidence that Kransco's failure promptly to convey to AES its knowledge of prior cervical injuries contributed to AES's failure to recognize the substantial likelihood of excess judgment." Accordingly, judgment was entered in favor of Kransco for the full amount of damages as calculated by the jury, plus prejudgment interest and costs.

## C. *The Appeal*

Both parties appealed on a number of grounds. The Court of Appeal affirmed the judgment in its entirety. Of relevance here, the court held that in an insured's action against its insurer for breach of the implied covenant of good faith and fair dealing, the insured's comparative bad faith is not an affirmative defense.[7] The court further held that on the facts of this case comparative negligence was not an available defense.[8]

---

[7]The court went on to hold that even if comparative bad faith were available as a defense, it would be available only when the insured's conduct interfered with the insurer's ability to fairly evaluate a settlement offer, a situation not shown on these facts. This dictum was inconsistent with the court's primary holding that, as a matter of law and policy, an insured's comparative bad faith cannot set off or reduce the tort damages available to the insured when the insurer breaches the covenant of good faith and fair dealing.

[8]Another issue raised in the Court of Appeal was whether the compensatory damages that Kransco could recover for AES's bad faith included the amount of punitive damages awarded against Kransco in the Wisconsin litigation. Because Wisconsin law permits indemnity coverage for punitive damages, while California law does not, the Court of Appeal treated the

## II. Discussion

### A. AES Breached the Covenant of Good Faith and Fair Dealing by Unreasonably Failing to Settle the Underlying Action on Kransco's Behalf Within Policy Limits

It has long been recognized in California that "[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." (*Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883].) This principle applies equally to insurance policies, which are a category of contracts. (*Ibid.*) Because the covenant is a contract term, in most cases compensation for its breach is limited to contract rather than tort remedies. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 684 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*).) But "[a]n exception to this general rule has developed in the context of insurance contracts where, for a variety of policy reasons, courts have held that [an insurer's] breach of the implied covenant will provide the basis for an action in tort." (*Ibid.*) The availability of tort remedies in the limited context of an *insurer's* breach of the covenant advances the social policy of safeguarding an insured in an inferior bargaining position who contracts for calamity protection, not commercial advantage. (*Foley, supra,* 47 Cal.3d at pp. 684-685; see also *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819-820 [169 Cal.Rptr. 691, 620 P.2d 141].)

The scope of the duty of good faith and fair dealing depends upon the purposes of the particular contract because the covenant "is aimed at making effective the agreement's promises." (*Foley, supra,* 47 Cal.3d at p. 683; *Egan v. Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 818.) In the context of an insurance policy, "[t]he terms and conditions of the policy define the duties and performance to which the insured is entitled." (*Western Polymer Technology, Inc. v. Reliance Ins. Co.* (1995) 32 Cal.App.4th 14, 24 [38 Cal.Rptr.2d 78].) "One of the most important benefits of a maximum limit insurance policy is the assurance that the company will provide the insured with defense and indemnification for the purpose of protecting him from

issue as presenting a conflict of law and resolved the conflict in favor of the application of Wisconsin law, thus permitting Kransco to include the Wisconsin punitive damages within the amount of compensatory damages recoverable from AES.

We initially included this issue within our grant of review but deferred briefing on it. After we issued our opinion in *PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310 [84 Cal.Rptr.2d 455, 975 P.2d 652], however, we amended our order granting review to encompass only the availability of a comparative bad faith defense. Accordingly, we express no opinion on the Court of Appeal's resolution of the punitive damages question.

liability. Accordingly, the insured has the legitimate right to expect that the method of settlement within policy limits will be employed in order to give him such protection." (*Commercial Union Assurance Companies v. Safeway Stores, Inc.* (1980) 26 Cal.3d 912, 918 [164 Cal.Rptr. 709, 610 P.2d 1038].)

█ Consistent with these principles, a liability insurance policy's express promise to defend and indemnify the insured against injury claims implies a duty to settle third party claims in an appropriate case. (*Commercial Union Assurance Companies v. Safeway Stores, Inc., supra,* 26 Cal.3d at p. 917; *Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425, 430 [58 Cal.Rptr. 13, 426 P.2d 173]; *Comunale v. Traders & General Ins. Co., supra,* 50 Cal.2d at p. 659.) "More specifically, the insurer must settle within policy limits when there is substantial likelihood of recovery in excess of those limits. [Citations.] [¶] The duty to settle is implied in law to protect the insured from exposure to liability in excess of coverage as a result of the insurer's gamble—on which only the insured might lose." (*Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937, 941 [132 Cal.Rptr. 424, 553 P.2d 584].) An insurer that breaches its implied duty of good faith and fair dealing by unreasonably refusing to accept a settlement offer within policy limits may be held liable for the full amount of the judgment against the insured in excess of its policy limits. (*Commercial Union Assurance Companies v. Safeway Stores, Inc., supra,* 26 Cal.3d at pp. 916-917.)

Here, the jury concluded AES breached its duty of good faith and fair dealing owed Kransco by rejecting Hubert's $750,000 settlement offer, which was within the $900,000 policy limits, despite a substantial likelihood of recovery in excess of those limits. █ AES did not challenge that conclusion on appeal, but instead argued it should not be liable for the full amount of the judgment because Kransco's own litigation misconduct or comparative fault contributed to the excess verdict. Specifically, AES claims the Wisconsin jury in the underlying *Hubert* action assessed $10 million in punitive damages to punish Kransco for its false and incorrect interrogatory responses made during pretrial discovery.

B. *Comparative Bad Faith as an Affirmative Defense in a Third Party Insurance Bad Faith Action*

Should AES be permitted to assert Kransco's comparative bad faith as an affirmative defense in the bad faith action brought against it by Kransco for breach of the covenant of good faith and fair dealing? More specifically to the facts at hand, may an insurer that breaches the covenant of good faith and fair dealing, by failing to settle a third party action within policy limits

when there is a substantial risk of an excess judgment, later fault the insured's litigation misconduct for contributing to the amount of the verdict in excess of policy limits? In entering judgment notwithstanding the verdict, and in affirming that judgment on appeal, the trial court and Court of Appeal correctly answered "no."

To be sure, the "duty of good faith and fair dealing in an insurance policy is a two-way street, running from the insured to his insurer as well as vice versa." (*Commercial Union Assurance Companies v. Safeway Stores, Inc.*, *supra*, 26 Cal.3d at p. 918.) But the scope of the insured's duty of good faith and fair dealing, and the remedies available to the insurer for a breach of that duty, are fundamentally and conceptually distinct from the insurer's reciprocal duty, and the remedies available to the insured for breach of that duty, under the insurance policy. As this court has explained, it is an *insurer's* breach of the covenant of good faith that is governed by tort principles, at least as concerns the availability of tort damages. (*Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574 [108 Cal.Rptr. 480, 510 P.2d 1032] (*Gruenberg*).) In contrast, an *insured's* breach of the covenant is not a tort. (See *California Fair Plan Assn. v. Politi* (1990) 220 Cal.App.3d 1612, 1618 [270 Cal.Rptr. 243].) An insurer's tort liability is predicated upon special factors inapplicable to the insured. (*Foley*, *supra*, 47 Cal.3d at pp. 684-685 [insurer tort liability based on special relationship with insured]; *California Fair Plan Assn. v. Politi, supra*, 220 Cal.App.3d at pp. 1618-1619 [same].)

We suggested in *Gruenberg, supra,* 9 Cal.3d 566, that an insurer's breach of the covenant of good faith and fair dealing is not directly comparable with the insured's contractual breach, concluding that the insured's alleged contractual breach of the policy's cooperation clause by failing to submit to an examination and produce requested documents did not excuse the insurer's duty of good faith and fair dealing. (*Id.* at pp. 576-578.) We observed that "the insurer's duty is unconditional and *independent* of the performance of [the insured's] contractual obligations." (*Id.* at p. 578, italics added.)

Applying comparative fault principles (see *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393])[9] by recognizing a comparative bad faith defense in a third party insurance bad faith action would set the insurer's tortious breach of the covenant against the insured's contractual breach of the covenant, even though contractual breaches are generally excluded from comparative fault allocations. (See 12

---

[9]In *Li v. Yellow Cab Co., supra,* 13 Cal.3d 804, this court abolished the common law doctrine of contributory negligence and adopted in its stead a "general scheme of assessment of liability in proportion to fault" (*id.* at p. 825), i.e., a comparative negligence standard.

West's U. Laws Ann. (1996) U. Comparative Fault Act, com. to § 1, p. 128 [comparative fault inapplicable to "actions that are fully contractual in their gravamen"].) This distinction between tort and contract liabilities convinced one state supreme court to reject comparative bad faith as a defense in a bad faith action against an insurer ("the [insurer's] tort cannot be offset comparatively by the [insureds'] contract breach") and characterize the differing legal concepts as "apples and oranges." (*Stephens v. Safeco Ins. Co. of America* (1993) 258 Mont. 142 [852 P.2d 565, 568-569]; see also *First Bank v. Fidelity and Deposit Ins.* (1996) 1996 Okla. 105 [928 P.2d 298, 306-309] (*First Bank*) [rejecting comparative bad faith defense for an insured's misperformance of its contractual duties in a bad faith action against the insurer for refusal to defend].)

In *First Bank, supra,* 928 P.2d 298, the Oklahoma Supreme Court noted its reliance on this court's jurisprudence (*Crisci v. Security Ins. Co., supra,* 66 Cal.2d 425; *Comunale v. Traders & General Ins. Co., supra,* 50 Cal.2d 654) in adopting as the law in Oklahoma California's treatment of an *insurer's* bad faith refusal to settle a claim as a tort. (*First Bank, supra,* 928 P.2d at p. 306.) The *First Bank* court, however, rejected the rationale of a subsequent California Court of Appeal decision—*California Casualty Gen. Ins. Co. v. Superior Court* (1985) 173 Cal.App.3d 274, 283 [218 Cal.Rptr. 817] (*California Casualty*)—which for the first time held that in a bad faith action the insurer could interpose as a defense the tort concept of comparative fault, in an entirely new form known as comparative bad faith.[10] In the Court of Appeal and now in this court, AES places principal reliance on *California Casualty*.

Although *California Casualty* involved a bad faith action by an insured against her insurer for breach of the covenant of good faith and fair dealing, it did not, as in this case, involve a claim of bad faith refusal to settle a third party action within policy limits on the insured's behalf. The insured in *California Casualty* asserted her automobile insurer in bad faith had failed to pay a claim she had suffered under the uninsured motorist provisions of her automobile policy. (*California Casualty, supra,* 173 Cal.App.3d at pp. 276-277.) The insurer in turn sought to assert as an affirmative defense that the insured and her attorney " '[were] guilty of bad faith conduct in the prosecuting, handling and management of [her] uninsured motorist claim.' " (*Id.* at p. 277.)

---

[10]This court has not previously decided whether an insurance company may assert a comparative fault defense in a bad faith action. An insurer raised this or a similar issue in *Johansen v. California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9 [123 Cal.Rptr. 288, 538 P.2d 744], but we did not resolve it because the record failed to support the contention "that the excess judgment can be attributed to [the] insured's conduct." (*Id.* at p. 20.)

The *California Casualty* court set the insurer's breach of the covenant of good faith and fair dealing against the insured's breach in applying principles of comparative fault, and held that an insurer sued by its insured for failure to pay her claim for uninsured motorist coverage may allege the insured's comparative bad faith as an affirmative defense. (*California Casualty, supra,* 173 Cal.App.3d at pp. 276-284.) The court ruled that the insured's undue delay in submitting information necessary to process her claim, which contributed to the insurer's failure to pay the claim, may reduce the insured's recovery for damages resulting from the insurer's bad faith nonpayment. (*Id.* at p. 283.) Responsibility and liability for damages were to be allocated between insurer and insured in proportion to the amount of bad faith attributable to each party. (*Ibid.*; cf. *Li v. Yellow Cab Co., supra,* 13 Cal.3d at p. 829 [adopting and explaining comparative negligence standards].)

The *California Casualty* court's recognition of a comparative bad faith defense sounding in tort does not withstand scrutiny in light of the authorities discussed above distinguishing an insurer's tortious breach of the covenant from an insured's contractual breach. The court reasoned that the comparative fault tort doctrine should apply to insurance bad faith cases because breach of the covenant is a tort: "While the duty of good faith and fair dealing arises out of a contractual relationship between the parties, breach of the duty and ensuing damages are governed by tort principles." (*California Casualty, supra,* 173 Cal.App.3d at p. 283.) What the *California Casualty* court overlooked, however, is that it is an *insurer's* breach of the covenant of good faith and fair dealing that is governed by tort principles. (*Gruenberg, supra,* 9 Cal.3d at p. 574.) An *insured's* breach of the covenant is not a tort, and hence does not give rise to tort damages recoverable by the insurer. (*California Fair Plan Assn. v. Politi, supra,* 220 Cal.App.3d at p. 1618.)

As the Court of Appeal below recognized, the *California Casualty* court's holding is grounded on the faulty premise that the obligations of insurer and insured—and thus their bad faith—are comparable. They are not. The parties are bound by a reciprocal obligation of good faith and fair dealing, but the particular duties differ given the differing performance due under the contract of insurance. A fundamental disparity exists between the insured, which performs its basic duty of paying the policy premium at the outset, and the insurer, which, depending on a number of factors, may or may not have to perform its basic duties of defense and indemnification under the policy. (See *Foley, supra,* 47 Cal.3d at p. 693 [noting the "insurer's and insured's interest are financially at odds"].) An insured is thus not on equal footing

with its insurer—the relationship between insured and insurer is inherently unequal, the inequality resting on contractual asymmetry. An insurer's tort liability for breach of the covenant is thus predicated upon special policy factors inapplicable to the insured. (*Foley, supra,* 47 Cal.3d at pp. 684-685.)

The scope of the *insured's* duty of good faith and fair dealing in turn is confined by the express contractual provisions of the policy. (*Western Polymer Technology, Inc. v. Reliance Ins. Co., supra,* 32 Cal.App.4th at p. 24.) An insured's reciprocal duty of good faith and fair dealing does not always necessitate reciprocal conduct. (See, e.g., *Commercial Union Assurance Companies v. Safeway Stores, Inc., supra,* 26 Cal.3d at pp. 917-921 [insurer may be obligated to accept a settlement offer to protect its insured from personal liability but insured is not similarly obligated].) Because an insured's breach of the covenant does not sound in tort, the insured's contractual breach of an *express* policy provision cannot be raised by the insurer as a defense in a bad faith action brought against it by the insured. It would be illogical to allow the insurer in such a suit to instead interpose as a defense the insured's contractual breach of an *implied* policy provision (i.e., the covenant of good faith and fair dealing) based on those same express policy terms.

The recent decision in *Agricultural Ins. Co. v. Superior Court* (1999) 70 Cal.App.4th 385 [82 Cal.Rptr.2d 594] (*Agricultural*) is in accord. *Agricultural* involved a bad faith action arising out of an insurance claim for earthquake damage. After the insurer paid the claim in part, controversies arose, ultimately leading to the insured's suit for breach of contract and bad faith. The trial court stayed the action to allow the insurer to complete its investigation. The insurer did, and then cross-complained, contending that the insured's claim was in significant part falsified. The insurer pleaded various contract theories, and also the tort theories of fraud and so-called reverse bad faith, i.e., tortious breach of the covenant of good faith and fair dealing by the insured. The insured demurred to the tort theories, and the trial court sustained the demurrers without leave to amend. (*Id.* at p. 389.)

In denying in part the insurer's petition for a writ of mandate to set aside the trial court's order sustaining the demurrer to the reverse bad faith cross-claim, the *Agricultural* court explained: "An insurer has no claim against its insured in tort for breach of the covenant of good faith and fair dealing. A breach of this covenant is, at base, a breach of contract. A relationship including specialized circumstances of reliance and dependence

is necessary to transmute such a contractual breach into a tort. Such circumstances do not exist in the context of an insured's responsibilities toward its insurer, or in the reciprocal context of an insurer's legitimate expectations from its insured. Although a false claim by an insured might trigger adverse contractual or penal consequences, the obligations undertaken by an insured in entering into an insurance contract are simply not of the same character as the obligations undertaken by an insurer. Hence an insured does not bear a risk of affirmative tort liability for failing to perform the panoply of indefinite but fiduciary-like obligations contained within the concept of 'insurance bad faith.' The trial court therefore correctly sustained the insured's demurrer to the insurer's 'reverse bad faith' claim . . . ." (*Agricultural, supra,* 70 Cal.App.4th at pp. 389-390.)

In granting in part the insurer's petition for mandamus relief to set aside the trial court's order sustaining the demurrer to the *fraud* cross-claim, the *Agricultural* court explained: "Although an insured does not bear the type of obligations which can give rise to a claim for tortious breach of covenant, an insured—no different than everyone else—has a duty not to defraud. Firstly, an insured must not defraud in the procurement of the policy. Secondly, an insured must not defraud in making a claim on the policy. When an insured makes a claim to its insurer, the insurer's duty to investigate is triggered. If, because of the insured's false factual assertions, the insurer incurs expenses that would otherwise not have been necessary, justifiable detrimental reliance can be pleaded by the insurer. Although a mere inflated opinion of a claim's value is not fraud, deliberately false factual assertions can be fraud. There is a significant distinction between a mere aggressive claims position and an outright factual fraud. Hence the insurer's petition will be granted to the extent of directing the trial court to vacate its order sustaining without leave to amend as to the fraud cause of action . . . ." (*Agricultural, supra,* 70 Cal.App.4th at p. 390.)

We agree with the analysis and holding in *Agricultural,* and disagree with the *California Casualty* court's extension of tort comparative fault principles to an insured's contractual breach of the covenant of good faith and fair dealing. By allowing an insurer to assert a defense of comparative bad faith, *California Casualty*'s holding misleadingly equates an insured's contractual breach of the reciprocal covenant of good faith and fair dealing with an insurer's tortious breach of the covenant. The holding is confusing and inconsistent insofar as it acknowledges an insured's breach of the covenant is not actionable in tort, but nonetheless can give rise to tort consequences

because the insurer may assert it as a defense in a bad faith action to lessen responsibility for its own tortious conduct.[11]

The Chief Justice disagrees, observing that in *Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696], at pages 314-315, this court explained that the comparative fault doctrine is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury in order to arrive at an equitable apportionment or allocation of loss. (Conc. & dis. opn. of George, C. J., *post*, at pp. 414-415.) In the context of comprehensive general liability coverage, however, the insured is purchasing insurance in exchange for the payment of premiums precisely *to avoid financial liability for its own negligent or fault-based conduct* causing injury to others, and *to further insure against the inherent risks of litigation that can result in a larger verdict against it*, up to the amount of its policy limits. Hence, when an insured sues its liability insurer for breach of its express promise to defend and indemnify the insured against injury claims, and for breach of the concomitant duty to reasonably settle third party claims within policy limits under the covenant of good faith and fair dealing, commonsense notions of relative responsibility of the parties for proximate causation of an injury, equitable allocation of

---

[11]The Chief Justice suggests *California Casualty* has been "the seminal California decision that has been the controlling California authority on this issue for the past 15 years." (Conc. & dis. opn. of George, C. J., *post*, at p. 414.) *California Casualty* is the *only* published California appellate court decision to have discussed the issue and affirmatively recognized a comparative bad faith defense in the insurance bad faith arena. (But see *Patrick v. Maryland Casualty Co.* (1990) 217 Cal.App.3d 1566, 1572 [267 Cal.Rptr. 24] [acknowledging *California Casualty*'s holding in dictum as supportive of a comparative negligence defense], discussed *post*, at pp. 410-412; *Travelers Ins. Co. v. Lesher* (1986) 187 Cal.App.3d 169, 192 [231 Cal.Rptr. 791] ["[a]ssuming arguendo the correctness of the *California Casualty* court's analysis" without discussion and rejecting its application to the case before it].)

Nor has *California Casualty* been accepted or treated as controlling authority in sister state jurisdictions or the federal courts. We have noted that the Oklahoma Supreme Court in *First Bank, supra*, 928 P.2d at page 308, expressly rejected the rationale and holding of *California Casualty*, and that the Montana Supreme Court in *Stephens v. Safeco Ins. Co. of America, supra*, 852 P.2d at pages 568-569, likewise refused to recognize a comparative bad faith defense. (*Ante*, at p. 403.) Similarly, in *Johnson v. Farm Bureau Mut. Ins. Co.* (Iowa 1995) 533 N.W.2d 203, 207-208, the Iowa Supreme Court refused to recognize the analogous tort of reverse bad faith. Appellate courts in Texas, Oregon and Florida, and district courts in the Virgin Islands and Hawaii, have likewise all refused to recognize an affirmative defense of comparative bad faith. (See *Southland Lloyd's Ins. Co. v. Tomberlain* (Tex.Ct.App. 1996) 919 S.W.2d 822, 832, fn. 5; *Stumpf v. Continental Cas. Co.* (1990) 102 Or.App. 302 [794 P.2d 1228]; *Nationwide Property & Cas. Ins. Co. v. King* (Fla.Dist.Ct.App. 1990) 568 So.2d 990, 990-991; *In re Tutu Water Wells Contamination Litigation* (D.V.I. 1999) 78 F.Supp.2d 436, 454-455; *Wailua Associates v. Aetna Cas. and Sur. Co.* (D. Hawaii 1998) 183 F.R.D. 550, 559-560.)

To the extent it is inconsistent with the conclusions reached herein, *California Casualty Gen. Ins. Co. v. Superior Court, supra*, 173 Cal.App.3d 274, is disapproved.

loss, and indeed responsibility for less-than-perfect litigation conduct that leads to an inflated verdict, have limited, if any, application.

We agree with the Court of Appeal below that the jury should not have been instructed at all with principles of comparative bad faith, and accordingly reject AES's argument that it was error to affirm the trial court's judgment notwithstanding the verdict entered in Kransco's favor.

■ We observe that rejection of comparative bad faith in this context does not leave the insurer without remedies for an insured's breach of the covenant of good faith and fair dealing. Evidence of an insured's misconduct may factually disprove the insurer's liability for bad faith by showing the insurer acted reasonably under the circumstances. (*Blake v. Aetna Life Ins. Co.* (1979) 99 Cal.App.3d 901, 918-924 [160 Cal.Rptr. 528] [no insurer liability]; see also *Campbell v. Allstate Ins. Co.* (1963) 60 Cal.2d 303, 305 [32 Cal.Rptr. 827, 384 P.2d 155] [breach of cooperation clause]; Pryor, *Comparative Fault and Insurance Bad Faith* (1994) 72 Tex. L.Rev. 1505, 1522-1525 [discussing contract defenses].) The insured's breach of the covenant of good faith and fair dealing is also separately actionable as a contract claim. (*California Fair Plan Assn. v. Politi, supra,* 220 Cal.App.3d at pp. 1614, 1618.) Some forms of misconduct by an insured will void coverage altogether under the insurance policy. (See *Imperial Casualty & Indemnity Co. v. Sogomonian* (1988) 198 Cal.App.3d 169, 182 [243 Cal.Rptr. 639] [material misrepresentation of policy application].) Of course, without coverage there can be no liability for bad faith on the part of the insurer. (*Waller v. Truck Ins. Exchange* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619].) And, as explained in *Agricultural, supra,* 70 Cal.App.4th at page 390, an insured's *fraudulent* misconduct is separately actionable and can give rise to tort damages. These remedies adequately serve to protect an insurer from the insured's misconduct without creating the logical inconsistencies and troublesome complexities of a defense of comparative bad faith.

■ The focus of AES's defense, at trial of the bad faith action, on appeal, and in the briefing on review in this court, has been to show that Kransco's assertedly negligent litigation conduct in the underlying *Hubert* action, specifically the tendering of the two false interrogatory responses during pretrial discovery, was the chief proximate cause of the huge *Hubert* punitive damages award handed down by an inflamed Wisconsin jury, allegedly incensed by Kransco's litigation misconduct.

As a factual matter, there are a number of flaws in AES's argument. First, Kransco's general counsel, Stuart Schneck, who prepared and submitted the

false interrogatory responses on Kransco's behalf, testified in the California bad faith action but was *not* a witness in the underlying Wisconsin products liability action. Hence, the Wisconsin jury was not presented with direct evidence that Schneck had been advised of the prior Slip 'N Slide accidents before answering the interrogatories, a circumstance bearing directly on the question whether competent admissible *evidence* (as opposed to the arguments of Hubert's counsel, which were not evidence) supports an inference that the false interrogatory responses were a legal proximate cause of the Wisconsin jury's excess verdict.

Second, in finding Kransco liable and awarding damages in the *Hubert* action, the Wisconsin jury may have relied exclusively upon the insured's manufacture and marketing of a defective product and the damages caused by the product. Both the compensatory and punitive damage awards properly were based only on the insured's production and sale of the Slip 'N Slide toy, not upon the insured's erroneous discovery response. Although the plaintiff's counsel in the Wisconsin action may have taken advantage of the insured's erroneous discovery response to embellish its argument that the insured had acted maliciously in continuing to market and to profit from a toy that it knew had caused serious injuries in the past, the damage award did not reflect any damage or loss caused by the false or erroneous discovery response, and indeed there is no indication that Hubert suffered any damage as a result of the insured's incorrect interrogatory responses. Presumed to have followed the law, the Wisconsin jury determined its award on the basis of Kransco's underlying conduct that caused the plaintiff's injury—the marketing of a dangerous product—conduct that was covered under Kransco's policy of insurance with AES. As a factual matter, AES has not demonstrated that Kransco's litigation misconduct was a proximate cause of the Wisconsin jury's excess verdict and huge punitive damages award.

Third, the record establishes that AES was made fully aware of the false interrogatory responses prior to its rejection of Hubert's $750,000 settlement offer, and that Kransco and its counsel approved the settlement terms and tendered Kransco's $100,000 self-insured retention. AES was thus in sole control of the decision whether to accept the Hubert settlement offer, well within policy limits, and rejected that offer with full knowledge that Kransco had furnished two false interrogatory responses during pretrial discovery. Hence, Kransco's litigation misconduct was not a factual cause of AES's decision to reject Hubert's midtrial settlement offer, the rejection of which

ultimately led to submission of the case to the Wisconsin jury and the ensuing excess verdict and unprecedented punitive damages award.[12]

As a matter of law, AES's assertion that Kransco's two false interrogatory responses alone begot the Wisconsin jury's record-breaking punitive damages award in the *Hubert* action is likewise flawed. Generally, punitive damages may be awarded only if it is proven that the defendant engaged in conduct intended to cause injury or engaged in despicable conduct with a conscious disregard of the rights or safety of others. (See, e.g., Civ. Code, § 3294, subds. (a), (c).) It is questionable whether Kransco's two false interrogatory responses, exploited in the eyes of the Wisconsin jury largely through Hubert's counsel's impassioned arguments, could themselves validly be deemed a legal proximate cause of the jury's punitive damages award and verdict, as AES would have us conclude.

Most importantly however, and as recognized by the Court of Appeal below, to have any meaning, the express promise of a liability insurer to defend and indemnify the insured against injury claims, and the implied duty to reasonably and in good faith settle third party claims within policy limits in an appropriate case, must extend to insureds that are less than perfect litigants. An insured's known weaknesses as a litigant should inform the insurer's assessment of the likelihood of an excess judgment, not diminish the insurer's obligation to reasonably accept settlement offers within policy limits. (See *Kinder v. Western Pioneer Ins. Co.* (1965) 231 Cal.App.2d 894, 898, 903 [42 Cal.Rptr. 394] [insured's weakness as a trial witness due to contradictory pretrial statements and low intelligence provided additional reason to settle case].) An insurer legitimately expects its insured's cooperation in defending third party injury claims, but cooperation does not demand flawless discovery responses.

We again emphasize that a liability insurer is not without redress for an insured's litigation misconduct, be it negligent or intentional. Evidence of the insured's misconduct or breach of its express obligations under the terms of the insurance policy (i.e., breach of the cooperation clause) may support a number of contract defenses to a bad faith action, by voiding coverage, factually disproving the insurer's bad faith by showing the insurer acted reasonably under the circumstances, or forming the basis for a separate contract claim, and an insured's intentionally fraudulent conduct may give

---

[12]On the first day of trial in the *Hubert* action, the trial judge ruled that prior Slip 'N Slide accident victims would be permitted to testify on plaintiff's behalf, one from a wheelchair. This ruling apparently did not cause AES to reevaluate its assessment of Hubert's claim or later accept the settlement offer.

rise to tort damages. (*Ante,* at p. 408.) An insurer may not, however, assert an insured's comparative bad faith as an affirmative defense to partially absolve itself of its own tort liability for breach of the covenant of good faith and fair dealing.

## C. *Comparative Negligence*

AES also argued on appeal that the jury was properly instructed to compare Kransco's *negligence* in the preparation and trial of the underlying *Hubert* action (i.e., the pretrial tendering of incorrect interrogatory responses) with AES's bad faith failure to reasonably settle the *Hubert* action within policy limits, and to allocate fault and liability for the Wisconsin jury's excess verdict among the insured and insurer. The argument rested entirely upon the holding in *Patrick v. Maryland Casualty Co., supra,* 217 Cal.App.3d 1566 (*Patrick*). In *Patrick,* the insured sued his first party insurer for bad faith delay in paying his homeowners insurance claim for a storm-damaged roof. (*Id.* at pp. 1568-1569.) The insured included as damages his personal injuries suffered when he fell off the roof after tiring of the insurer's delay and undertaking the repairs himself. (*Id.* at pp. 1569-1570.) The *Patrick* court found that the insured's negligence in walking backward on a roof while dragging a heavy sheet of plywood warranted jury instructions on comparative fault and held that the trial court erred in refusing the insurer's requested instructions on the issue. (*Id.* at pp. 1570-1575.) The court rejected the insured's argument that his negligence should not be compared with the bad faith of the insurer. (*Id.* at p. 1572.)

Both the trial court (on Kransco's motion for judgment notwithstanding the verdict) and the Court of Appeal concluded *Patrick* and its application of the doctrine of comparative negligence to a first party insurance case was wholly inapplicable here. Although AES's briefing in this court for the most part addresses as the issue on review whether principles of comparative fault and comparative bad faith were properly invoked below to allocate liability for the excess verdict in the underlying *Hubert* action, AES cites and appears to rely on the holding in *Patrick* in arguing that the jury instructions on comparative bad faith *and comparative negligence* were properly given in this case.

Review was not granted on the matter of the propriety of the comparative negligence instructions, and accordingly that issue is not squarely before us. In any event, we need not address *Patrick*'s extension of comparative negligence principles to first party insurance bad faith actions because the instant third party insurance bad faith action case is factually distinguishable.

(*Patrick, supra,* 217 Cal.App.3d at pp. 1570-1575.) *Patrick* concerned a first party insured's negligent acts following an insurer's bad faith failure to pay a claim under a homeowners policy where those negligent acts—walking backwards on a roof while dragging a heavy sheet of plywood, patently the proximate cause of the insured's injuries when he fell from the roof—were outside the contractual relationship of the parties. (*Id.* at pp. 1569-1570.) Here, the contractual relationship of the parties vested AES with a continuing duty to reasonably settle the *Hubert* case so long as it was defending Kransco, as discussed above. While the insurer in *Patrick* had no duty to protect its insured when the latter determined to make his own roof repairs, AES did have a duty to protect Kransco during the *Hubert* litigation. As explained, AES was duty bound under the insurance policy to protect Kransco from an excess judgment, whether that judgment be the result of Kransco's negligence in marketing the Slip 'N Slide or its conduct as a litigant in the underlying third party personal injury action, or a combination of both.

The holding in *Patrick*, a first party insurance case, does not shield a third party insurer from full responsibility for its bad faith failure to settle a case even if the insured's litigation misconduct or mishandling of the claim inflated the size of the verdict, although as noted, evidence of such misconduct may support contract defenses, cross claims or separate causes of action for breach of the terms of the insurance contract otherwise available to the insurer. (See *ante*, at p. 408.)

### III. CONCLUSION

The judgment of the Court of Appeal is affirmed.

Mosk, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**MOSK, J.**—I concur in the opinion of the court.

I write separately to explain why I believe the court is right to conclude that an action by an insured for an insurer's breach of the covenant of good faith and fair dealing, which is implied in an insurance policy, should *not* allow an affirmative defense of comparative fault, in whatever form it might take.

A syllogistic argument for an affirmative defense of comparative fault is suggested by the Chief Justice and Justice Kennard in their separate opinions herein: Actions in tort allow an affirmative defense of comparative fault; an action by an insured for an insurer's breach of the covenant of good faith and

fair dealing is in tort; therefore, such an action allows such an affirmative defense.

This argument, however, fails to persuade.

We have held that an action by an insured for an insurer's breach of the covenant of good faith and fair dealing sounds, fundamentally and originally, in contract. (See generally *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683-684 [254 Cal.Rptr. 211, 765 P.2d 373].) The policy is a contract; the covenant is implied therein. Actions in contract do not allow an affirmative defense of comparative fault. Fault, comparative or otherwise, generally does not matter under the law of contracts. What matters, rather, is performance. Hence, performance with fault is sufficient, and nonperformance without fault is not enough.

But we have also held that an action by an insured for an insurer's breach of the covenant of good faith and fair dealing may be deemed to sound as well in tort. (See generally *Foley v. Interactive Data Corp., supra*, 47 Cal.3d at pp. 683-684.) We have done so in order to extend to individual insureds in individual cases against individual insurers the remedies of the law of torts, which are broader and deeper than those of the law of contracts. And we have done *that* in order to attempt to true the balance in the relationship between insurers and insureds generally in the world at large—a balance that we have found to be skewed in favor of insurers and against insureds—by providing further deterrents against nonperformance on the part of insurers to the detriment of insureds.

All this is not to say that we could not choose to treat an action by an insured for an insurer's breach of the covenant of good faith and fair dealing, for purposes of the affirmative defense of comparative fault, as sounding in tort.

Any such choice, however, would not be without consequences.

One effect might be to do finer justice on the unique facts of each particular case by equitably apportioning loss.

But another, corresponding, effect would be to limit or restrict the tort remedies extended to individual insureds in individual cases against individual insurers. Yet another effect following on this one would be to undermine the attempt to true the balance in the relationship between insurers and insureds generally in the world at large by removing or reducing deterrents against nonperformance by insurers detrimental to insureds. Still

another effect following on *this* one would be to foster more breaches by insurers and hence more actions by their insureds.

The effect first identified might help a handful of parties in the judicial sphere. The others, however, would hurt society as a whole in everyday life.

In conclusion, concurring in the opinion of the court, I join with my colleagues in affirming the judgment of the Court of Appeal.

**GEORGE, C. J.,** Concurring and Dissenting.—Although I agree with *the result* reached by the majority—upholding the determination of the trial court and the Court of Appeal that in this case plaintiff insured's damage award should not be reduced under either a comparative bad faith or comparative negligence theory—I do not agree with the majority's proposal to reject the comparative bad faith doctrine in its entirety and to disapprove *California Casualty Gen. Ins. Co. v. Superior Court* (1985) 173 Cal.App.3d 274 [218 Cal.Rptr. 817] (*California Casualty*), the seminal California decision that has been the controlling California authority on this issue for the past 15 years. Instead, I believe the court should rest its decision in this case solely upon the narrower, and fully dispositive, ground that the insured's conduct here at issue—negligently providing incorrect answers to a discovery request—does not represent a breach of the implied covenant of good faith and fair dealing and does not constitute the type of misconduct that properly may reduce an insurer's liability for damages resulting from its failure to accept a reasonable settlement offer.

In reaching the conclusion that California should adopt a rule precluding the application of a comparative bad faith doctrine *under any circumstance*, the majority relies upon the rationale that although an *insurer's* bad faith conduct may support a *tort* action and *tort* damages, an *insured's* bad faith conduct constitutes only *a breach of contract* and may not properly be used to reduce an insurer's *tort* liability. Even if an insurer may not itself bring a tort action against an insured for breach of the covenant of good faith and fair dealing and may seek only contract damages *for any loss the insurer sustains* as a result of the insured's bad faith conduct, however, it does not follow that when an insured seeks to recover tort damages against an insurer for breach of the covenant of good faith and fair dealing, the insured's tort recovery may not be reduced *to the extent that the insured's own bad faith conduct has contributed to the injury or loss of the insured* for which tort damages are sought.

In the past, this court has taken a broad view of the type of "comparative fault" of a plaintiff that may reduce damages in a tort action, permitting the

comparative fault doctrine to be applied in strict liability cases (see, e.g., *Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 734-742 [144 Cal.Rptr. 380, 575 P.2d 1162]; *Safeway Stores, Inc. v. Nest-Kart* (1978) 21 Cal.3d 322, 328-332 [146 Cal.Rptr. 550, 579 P.2d 441]) and even in cases in which a plaintiff voluntarily chooses to engage in an unusually risky sport, whether or not the choice to do so is unreasonable. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 314 [11 Cal.Rptr.2d 2, 834 P.2d 696].) As this court explained in *Knight*: "Past California cases have made it clear that the 'comparative fault' doctrine is a flexible, commonsense concept, under which a jury properly may consider and evaluate *the relative responsibility* of various parties for an injury (whether their responsibility for the injury rests on negligence, strict liability, *or other theories of responsibility*), in order to arrive at an 'equitable apportionment or allocation of loss.' [Citations.]" (*Knight, supra*, 3 Cal.4th at pp. 313-314, italics added.) In my view, it is neither fair nor compatible with our past comparative fault precedent to permit *an insured* to obtain *tort damages* when *an insurer's* breach of the covenant of good faith and fair dealing is a proximate cause of an injury or loss incurred by the insured, but to refuse to permit a proportionate reduction in such tort damages when *the insured's* own bad faith conduct also is a concurrent cause of *the insured's injury or loss.*

Contrary to the reasoning of the majority, the circumstances in which a plaintiff's conduct will support a reduction of recovery under the comparative fault or comparative responsibility doctrine are not limited to instances in which the plaintiff breaches a tort duty or may otherwise be held liable in tort. Indeed, the classic instance in which the comparative fault doctrine comes into play—that is, when a plaintiff's injury is caused in part by the plaintiff's failure to exercise due care with regard to his or her own safety—clearly demonstrates this point, because a plaintiff, of course, is not entitled to sue himself or herself in tort for a self-inflicted injury (and thus may not, for example, obtain recovery from his or her liability insurer for such an injury). Accordingly, rejection of the comparative bad faith doctrine cannot properly be defended on the theory that the insured owes no tort duty to the insurer or that the insured may be liable only in contract for any damage inflicted upon the insurer by the insured's bad faith conduct.[1]

It is true, as the majority points out, that in some circumstances a comparative bad faith doctrine may not be necessary to protect the interests

---

[1]Indeed, upon close analysis, it becomes clear that the majority's conclusion is not supported by the circumstance that an insurer may seek only contract (and not tort) damages from an insured for an injury *to the insurer* resulting from the insured's breach of the covenant of good faith and fair dealing. As noted above, when the comparative bad faith doctrine is invoked to reduce an insured's tort recovery, the reduction is justified by the circumstance that the insured's bad faith conduct has been found by the trier of fact to constitute one of the proximate causes of the loss or injury *to the insured* for which the insured is seeking tort

of the insurer. Thus, there will be instances in which an insurer may be able to establish that in light of the insured's bad faith conduct (for example, the withholding of crucial information), the insurer's own conduct (for example, a delay in paying a first party claim or the refusal to accept a settlement offer) did not constitute a breach of the covenant of good faith and fair dealing at all. And there may be other instances in which the harm caused by the insurer's bad faith conduct is sufficiently distinct from the harm caused by the insured's bad faith conduct that—even without a comparative bad faith doctrine—the insurer's tort liability will reflect only the harm caused by the insurer, and the insurer may bring a contract claim (or, in appropriate circumstances, a fraud claim) to recover for a separate injury that the insured's misconduct has inflicted upon the insurer.

But the existence of these circumstances in which a comparative bad faith doctrine is not necessary to ensure fair treatment of an insurer does not establish, as the majority implies, that a comparative bad faith doctrine is unnecessary in *any* circumstance. The comparative bad faith doctrine properly comes into play only in those circumstances in which both the insurer's bad faith conduct and the insured's own bad faith conduct are concurrent proximate causes of an indivisible harm or loss to the insured, such as emotional distress, for which the insured is seeking recovery in tort. It is precisely such circumstances that the alternative remedies relied upon by the majority do *not* reach. Thus, by rejecting the application of a comparative bad faith doctrine in all circumstances, the majority renders the insurer solely responsible for a loss or harm for which both the insurer and the insured are responsible—the very unfairness and inequity that the comparative fault doctrine is designed to alleviate.

Accordingly, in a case like *California Casualty, supra*, 173 Cal.App.3d 274, in which an insured seeks to obtain tort damages for an insurer's alleged bad faith delay in failing to pay benefits due under a first party

recovery, and not because of some independent harm that the insured's bad faith conduct has inflicted upon the insurer. When the harm imposed upon the insurer by an insured's bad faith conduct lies simply in the circumstance that the insured's bad faith conduct has contributed to a loss to the insured for which the insurer may be liable in tort, application of the comparative bad faith doctrine to determine what proportion of the loss should be allocated to the insurer on the one hand, and to the insured on the other, is the only appropriate means to measure the economic harm that the insured's bad faith conduct has inflicted upon the insurer. Thus, even if it were appropriate to focus upon the circumstance that the insurer is limited to recovering contract damages from an insured for the insured's breach of the covenant of good faith and fair dealing, in this setting the insurer's contract damages logically would be measured by the insured's proportionate responsibility for the tort damages, which is the same amount that would be deducted from the insured's gross tort damages under the comparative bad faith doctrine.

insurance policy, but in which the insured's own bad faith conduct in failing to provide information to the insurer allegedly played some part in causing the resulting harm to the insured, I believe it would be appropriate for the insurer to obtain a reduction in the tort damages it must pay, based upon the comparative fault or relative responsibility of the insured for its own harm. Experience over the past 15 years since *California Casualty* was decided demonstrates the feasibility of applying comparative fault principles in such circumstances, and I see no reason to abandon completely the comparative bad faith doctrine at this point. Thus, I disagree with the majority insofar as it disapproves *California Casualty* and rejects the comparative bad faith doctrine in its entirety.

On the facts of the case now before us, however, I agree with the majority's determination that plaintiff's damages should not be reduced on either a comparative bad faith or comparative negligence theory. As the majority explains, the conduct of the insured here at issue—in negligently failing to provide a correct answer to a discovery request—does not constitute a breach of the insured's duty of good faith and fair dealing to its insurer, nor the type of fault that should reduce the insurer's liability. Furthermore the insured's erroneous discovery response may not properly be characterized as a "legal cause" of the excess-damage award for which the insured is seeking to recover in its bad faith action against the insurer.

Accordingly, I concur in the affirmance of the judgment of the Court of Appeal.

**KENNARD, J.**—I dissent.

The majority holds that comparative fault principles have no application to a policyholder's tort action against its liability insurer for unreasonable failure to settle a third party's suit against the policyholder. In so ruling, the majority denies juries in these insurance bad faith actions the ability to equitably apportion the policyholder's loss according to the respective fault of all parties responsible for that loss. I disagree.

As this court has stressed, "the 'comparative fault' doctrine is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury (whether their responsibility for the injury rests on negligence, strict liability, *or other theories of responsibility*), in order to arrive at an 'equitable apportionment or allocation of loss.' " (*Knight v. Jewett* (1992) 3 Cal.4th 296, 314 [11 Cal.Rptr.2d 2, 834 P.2d 696], italics added.) The comparative fault doctrine is flexible enough to encompass a tort action against an insurance company

for breach of a policy's implied covenant of good faith and fair dealing (commonly known as an insurance bad faith action), and the argument in favor of equitable apportionment is as compelling in this setting as in others this court has considered. Refusing to recognize comparative fault in this context sanctions the harsh, one-sided, all-or-nothing verdicts that this court has frequently criticized. As one commentator puts it: "Holding insurers wholly liable for damages for which they are only partly responsible, while allowing insureds to recover for self-inflicted harm, offends all notions of equity and fairness." (Richmond, *The Two-way Street of Insurance Good Faith: Under Construction, But Not Yet Open* (1996) 28 Loy. U. Chi. L.J. 95, 140, fn. omitted.)

The majority also holds that the insurance company's comparative fault defense in this case was flawed "[a]s a factual matter." (Maj. opn., *ante*, at p. 408.) Given its primary holding that a comparative fault defense is unavailable as a matter of law in this entire class of insurance bad faith tort actions, the majority's purpose in discussing these factual matters is obscure. In any event, I disagree that the evidence in this case fails to support the jury's verdicts finding comparative fault.

I

In *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] (*Li*), this court abolished the common law doctrine of contributory negligence, under which a plaintiff was denied any remedy for an injury proximately caused by the defendant's negligence if the plaintiff's own conduct involved an unreasonable risk of self-injury and was also a contributing cause of the plaintiff's injury. In place of the harsh, all-or-nothing contributory negligence doctrine, this court adopted a "general scheme of assessment of liability in proportion to fault." (*Id.* at p. 825; see also *Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 736-737 [144 Cal.Rptr. 380, 575 P.2d 1162]; *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 591 [146 Cal.Rptr. 182, 578 P.2d 899].)

Under the comparative fault system, it is normally a partial defense to a tort claim that the plaintiff's own "fault" was a contributing cause of the injury for which the plaintiff seeks damages. A policyholder's claim against an insurance company for breach of a policy's implied covenant of good faith and fair dealing sounds in tort. (*Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574-575 [108 Cal.Rptr. 480, 510 P.2d 1032].) Therefore, comparative fault should provide a partial defense to a bad faith claim against an insurance company, or, stated otherwise, a jury deciding a bad faith claim

should be instructed to equitably apportion the policyholder's loss according to the respective fault of the insurance company and the policyholder. In insurance bad faith tort actions, as in other tort actions this court has considered, there is no sound reason to conclude that a "common sense determination of proportional fault or proportional responsibility will be beyond the ken of . . . juries." (*Safeway Stores, Inc. v. Nest-Kart* (1978) 21 Cal.3d 322, 332 [146 Cal.Rptr. 550, 579 P.2d 441].) Here also, apportioning liability according to fault is preferable to an all-or-nothing outcome "from the point of view of logic, practical experience, and fundamental justice." (*Li, supra,* 3 Cal.3d 804, 808.) Simply put, the law should not allow a policyholder to shift to its insurance company the entire burden of damages for which the policyholder is partly responsible.

Of course, liability insurance exists in large measure to protect policyholders from the consequences of their own improvident conduct, and in this sense it is neither unfair nor uncommon for an insurance carrier to bear the full financial burden of a policyholder's careless conduct. But the carrier's obligation is not unbounded; the policy defines and limits the scope of the insurance company's responsibility. Although the carrier is required to indemnify the policyholder for the consequences of improvident conduct within the terms of the policy's coverage provisions, the policyholder should not be permitted to add to the carrier's burden by inflating the loss through additional improvident conduct outside the terms of the insurance bargain. To add this extra load to the carrier's burden is, in essence, to judicially enlarge the carrier's obligation without its consent.[1]

The majority never pauses to ask whether, in a policyholder's tort action against its insurance company for unreasonably failing to settle a third party claim, the jury should be permitted to equitably apportion the policyholder's loss according to the respective fault of the insurance company and the policyholder. The majority never frames the issue this way because it spends most of its energy considering and rejecting the concept of "comparative bad faith," a somewhat novel variant of comparative fault.[2] Almost as an afterthought, the majority also rejects the defense of comparative negligence. The

---

[1] Here, for example, the majority asserts that "[the insurance carrier] was duty bound under the insurance policy to protect [the policyholder] from an excess judgment, whether that judgment be the result of [the policyholder's] negligence in marketing the [defective product] or its conduct as a litigant in the underlying third party personal injury action, or a combination of both." (Maj. opn., *ante,* at p. 412.) Yet the majority fails to identify any provision of the policy obligating the carrier to protect the policyholder from an excess judgment resulting from litigation misconduct rather than from the marketing of a defective product.

[2] In California, the term "comparative bad faith" first appeared in *California Casualty Gen. Ins. Co. v. Superior Court* (1985) 173 Cal.App.3d 274 [218 Cal.Rptr. 817], a decision

majority's rejection of both comparative bad faith and comparative negligence necessarily means that equitable apportionment of loss is not permitted in insurance bad faith actions based on failure to settle third party suits.

In rejecting *comparative fault*, the majority argues primarily that the defense of *comparative bad faith* is conceptually flawed because an insurance company's breach of the implied covenant of good faith and fair dealing "is governed by tort principles" whereas a policyholder's breach of the same covenant "is not a tort" and thus "an insurer's breach of the covenant of good faith and fair dealing is not directly comparable with the insured's contractual breach." (Maj. opn., *ante*, at p. 402.) The majority insists that allowing a defense of comparative bad faith "misleadingly equates an insured's contractual breach of the reciprocal covenant of good faith and fair dealing with an insurer's tortious breach of the covenant" and "is confusing and inconsistent insofar as it acknowledges an insured's breach of the covenant is not actionable in tort, but nonetheless can give rise to tort consequences because the insurer may assert it as a defense in a bad faith action to lessen responsibility for its own tortious conduct." (Maj. opn., *ante*, at pp. 406-407, fn. omitted.)

In so arguing, the majority badly misses the point of comparative fault. Comparative fault is not about offsetting equivalent tort claims that parties have against each other for damages each has suffered. Rather, comparative fault is about the equitable apportionment of a single loss that only one of the parties has suffered. In the comparative fault context, it is not necessary that the plaintiff's fault be "directly comparable with" the defendant's fault. Nor is it necessary that the party who suffered the loss at issue engaged in conduct that breached a duty to the other party, resulted in loss to the other party, or would be legally actionable in tort if it did result in loss to the other party.

The source of the majority's confusion may be traced back to the term "contributory negligence." As the late Dean Prosser has explained, "It is perhaps unfortunate that contributory negligence is called negligence at all. 'Contributory fault' would be a more descriptive term. Negligence as it is commonly understood is conduct which creates an undue risk of harm to others. Contributory negligence is conduct which involves an undue risk of harm to the actor himself. Negligence requires a duty, an obligation of

---

authored by Justice Marcus Kaufman before his appointment to this court. The Chief Justice aptly describes it as "the seminal California decision that has been the controlling California authority on this issue for the past 15 years." (Conc. & dis. opn. of George, C. J., *ante*, at p. 414.) The majority disapproves this decision; I would not.

conduct to another person. Contributory negligence involves no duty, unless we are to be so ingenious as to say that the plaintiff is under an obligation to protect the defendant against liability for the consequences of the plaintiff's own negligence." (Prosser & Keeton on Torts (5th ed. 1984) § 65, p. 453, fns. omitted.)

What Dean Prosser says of contributory negligence is equally true of comparative negligence, comparative bad faith, and indeed of comparative fault in all its varieties as applied to a plaintiff. Because a plaintiff's comparative fault is conduct that contributed to the plaintiff's own loss, it is conduct that has resulted in self-inflicted harm. Because a plaintiff's comparative fault is invoked only to prevent the plaintiff from shifting all of the plaintiff's own loss onto another party, the plaintiff's conduct need not involve breach of any duty owed to another. It is sufficient that the plaintiff's conduct involved an unreasonable risk of self-inflicted injury and is at least partly responsible for the injury suffered. Thus, comparative negligence is self-directed negligence and comparative bad faith is, in essence, self-directed bad faith. Comparative bad faith means only that in determining whether a policyholder has acted unreasonably during third party litigation, a jury may properly consider the policyholder's contractual obligations to the carrier under the policy. To avoid confusion occasioned by the terms "negligence" and "bad faith," it would be better to use the term comparative fault as a substitute for both.

In real life situations, of course, conduct frequently involves an unreasonable risk of harm to both the actor and others. For example, careless driving likely to result in a collision is fault that is both self-directed and other-directed, because a vehicle collision may injure not only the careless driver but also the innocent drivers of other vehicles, as well as passengers and pedestrians. But if one driver sues another for injuries suffered in a collision, it is not essential to comparative fault as a defense that the plaintiff's own conduct risked harm to others or breached a duty owed to others. For example, a partial defense of comparative fault may be based on the plaintiff's failure to wear a seat belt (see *Housley v. Godinez* (1992) 4 Cal.App.4th 737 [6 Cal.Rptr.2d 111]), conduct that creates no risk of harm to others and breaches no duty owed to others, but merely creates an unreasonable risk of self-injury.

The same principles should apply to liability insurance litigation. When a third party sues a policyholder, the suit creates a risk of financial loss for both the policyholder and its liability carrier. The policyholder risks the amount of any deductible or self-insured retention, plus any amount by

which the third party's recovery exceeds the policy's liability coverage. The carrier risks the amount of the liability coverage it is contractually obligated to provide. Just as drivers sharing a highway have a common interest in avoiding a collision, a policyholder and its liability carrier have a common interest in avoiding or minimizing liability in a third party action. Any litigation misstep by either policyholder or carrier that increases the likelihood or the size of an adverse judgment threatens harm to the interests of both. For purposes of a carrier's partial defense of comparative fault, it should not be essential that a litigation misstep by the policyholder breached a duty owed to the carrier that would be actionable in tort. For purposes of the comparative fault defense and equitable apportionment of a loss suffered by the policyholder alone, it should be sufficient that the policyholder's misstep created an unreasonable risk of self-injury in the form of an adverse verdict in the third party action.

The majority betrays its confusion by its reliance on *Agricultural Ins. Co. v. Superior Court* (1999) 70 Cal.App.4th 385, 389 [82 Cal.Rptr.2d 594], a Court of Appeal decision that did not involve a comparative fault defense, but the assertion of a *cross-claim* for "reverse bad faith." The Court of Appeal itself correctly recognized that "the two issues pose significantly different considerations." (*Id.* at p. 396, fn. 3.) By relying on this decision, the majority misleadingly equates bad faith as a form of comparative fault with bad faith as a basis for a claim or cross-claim, although the two share almost nothing except the "bad faith" label. When a policyholder sues its insurance carrier for bad faith, allowing the carrier to assert bad faith as a form of comparative fault merely permits the jury to equitably apportionment the *damages suffered by the policyholder* according to the respective fault of the carrier and the policyholder. The focus of the comparative bad faith inquiry is the extent to which the policyholder's damages should be deemed self-inflicted. By contrast, an insurance carrier asserting a bad faith cross-claim is seeking *damages for a loss the carrier has suffered*, rather than equitable apportionment of a loss the policyholder has suffered. Unlike a partial defense of comparative fault, a cross-claim must meet all the requirements of an independent cause of action. For a cross-claim in tort, it is essential that the cross-defendant have owed a duty to the cross-plaintiff, that the cross-defendant have breached that duty, and that breach of that duty constituted a tort. For a partial defense of comparative fault, none of these elements is required.

Finding the majority's reasoning conceptually flawed and unpersuasive, I do not join in its holding. Instead, I would hold that the comparative fault system inaugurated by *Li, supra,* 13 Cal.3d 804, encompasses a policyholder's tort action against its liability carrier for breach of the policy's implied

covenant of good faith and fair dealing. In this context, comparative fault includes a policyholder's failure to exercise ordinary care in the preparation and trial of third party litigation when that failure is a legal cause of all or part of the adverse third party judgment in excess of policy limits. The jury in the bad faith action should be instructed that in determining whether the policyholder exercised ordinary care during the third party litigation, the jury should consider the policyholder's contractual responsibilities under the terms of the liability insurance policy.

## II

The other reasons that the majority offers for rejecting equitable allocation of loss under the comparative fault doctrine all relate to the particular facts of this case. Accordingly, I summarize those facts.

In June 1987, 35-year-old Michael Hubert broke his neck when he jumped on a water slide, called Slip 'N Slide, manufactured by Kransco, a California corporation. When Hubert sued Kransco in Wisconsin, where the injury occurred, Kransco tendered defense of the action to its primary liability carrier, American Empire Surplus Lines Insurance Company (AES), which assumed the defense. Because Kransco had a $100,000 self-insured retention under the policy, decisions regarding defense and settlement were made jointly by Kransco and AES.

The attorney representing Kransco at first thought there was a good chance of a defense verdict because Hubert had disregarded various warnings printed prominently on the Slip 'N Slide. In the event of liability, he thought compensatory damages might be relatively modest because the seriousness of Hubert's injuries was unclear.

During discovery, Hubert served Kransco with interrogatories asking, among other things, whether Kransco knew of prior Slip 'N Slide accidents resulting in cervical injuries to adults. The interrogatories required Kransco to diligently inquire among its agents and employees to elicit all available information. Kransco's in-house counsel, Stuart Schneck, prepared answers in which Kransco denied knowledge of any such prior accidents. Schneck affirmed that he had "made a due and diligent inquiry of [Kransco's] agents and employees with a view to eliciting all available information for the purpose of placing [himself] in a position to fully answer these interrogatories." This affirmation was false. Schneck had not spoken to Steven Schneider, Kransco's vice-president in charge of the redesign and manufacture of the Slip 'N Slide, who knew of two prior cervical injuries to adults.

The falsehood came to light during a conversation between Schneider and the attorney representing Kransco in the Wisconsin litigation. At this attorney's insistence, Kransco prepared an amended answer admitting knowledge

of two accidents in which the Slip 'N Slide had caused cervical injury to an adult. One accident had resulted in the user's death; the other accident had left the user a quadriplegic and he had accepted $1.5 million in settlement of his claim against Wham-O, the corporation from which Kransco had acquired the rights to manufacture the Slip 'N Slide. The amended response contained a new falsehood, putting the date of one accident much earlier than it was.

While the Wisconsin trial was in progress, Hubert offered to settle for $750,000. Kransco wanted to accept and agreed to contribute its $100,000 self-insured retention, but AES thought the offer was too high in light of the potential for a defense verdict and the doubts about the seriousness of Hubert's injuries. AES counteroffered for $450,000, which Hubert rejected. During these midtrial settlement negotiations, AES was aware of Kransco's false interrogatory answers but apparently misjudged their significance.

The trial proceeded, and Hubert introduced evidence of Kransco's false and misleading interrogatory answers. In his summation to the Wisconsin jury, Hubert's counsel used this damaging evidence to good effect. He argued that Kransco should be punished because it knew when it reintroduced the Slip 'N Slide that the product was inherently and unreasonably dangerous as shown by its knowledge of the prior adult cervical injuries, one fatal and the other catastrophic. Hubert's counsel argued that the false interrogatory answers were part of a plan by Kransco to cover up its own knowledge of the Slip 'N Slide's dangerous propensities. As further evidence of Kransco's supposed arrogance and mendacity, Hubert's counsel pointed to the amended interrogatory answer's incorrect dating of one of the prior accidents, which counsel suggested was an attempt by Kransco to diminish the significance of this incident by making it appear more remote in time. The Wisconsin jury awarded Hubert $12.3 million in damages, of which $10 million was punitive damages.

Kransco then brought this action in California against AES, alleging that AES had breached the implied covenant of good faith and fair dealing by unreasonably failing to accept Hubert's settlement offer. Kransco sought as damages the amount by which the Wisconsin judgment exceeded the coverage provided by AES's policy, plus interest. Instructed on comparative fault principles, the California jury returned verdicts finding that although AES had unreasonably refused the midtrial settlement offer, Kransco was also at fault in submitting the false interrogatory answers. Finding that each party's fault was a legal cause of the excess verdict, the jury apportioned fault 90 percent to Kransco and 10 percent to AES.

Concluding that it had erred in instructing the jury on comparative fault, the trial court granted Kransco's motion for judgment notwithstanding the verdict and ordered judgment for Kransco for the full amount of compensatory damages found by the jury. On appeal, the Court of Appeal affirmed the judgment.

The majority asserts that comparative fault cannot apply on these facts because AES was aware of Kransco's false interrogatory responses when it rejected Hubert's settlement offer and so "Kransco's litigation misconduct was not a factual cause of AES's decision to reject Hubert's midtrial settlement offer . . . ." (Maj. opn., *ante*, at p. 409.) Here also, the majority displays a misapprehension of comparative fault principles: The issue is not apportionment of fault for the failure to settle, it is apportionment of fault for the excess judgment.

To understand why this is so, examples from other tort liability contexts may be helpful. Suppose, for example, that the driver of one vehicle sues the driver of another vehicle for injuries sustained in a collision. Suppose further that the evidence at trial reveals that the defendant drove carelessly and that the plaintiff drove carefully but failed to wear a seat belt. Although the plaintiff's failure to wear a seat belt in no sense caused either the defendant's careless driving or the collision, it nonetheless may provide the basis for a comparative fault apportionment if the evidence reveals that the plaintiff's injuries would have been less severe had the plaintiff worn a seat belt. (*Housley v. Godinez, supra,* 4 Cal.App.4th 737.)

To take another example, suppose the driver of a vehicle is injured when his vehicle leaves the roadway and overturns. The driver sues the vehicle's manufacturer, claiming negligent vehicle design caused the rollover, and the manufacturer asserts comparative fault, claiming that the plaintiff negligently drove the car off the roadway. The comparative fault defense is permitted even though the plaintiff's careless driving in no sense caused or contributed to the defendant's defective design of the vehicle. (See *Daly v. General Motors Corp., supra,* 20 Cal.3d 725, 736-737.)

As these examples illustrate, the comparative fault inquiry has always been understood to include *all fault that contributed to the particular injury or harm at issue,* and never before has a defendant been required to show that the plaintiff's fault affected the defendant's own conduct. If this requirement does not exist in other comparative fault situations, why does the majority insist on it here? Nothing about insurance bad faith litigation justifies this novel requirement. The majority's reasoning presses back into

service the "last clear chance" doctrine that this court expressly abolished in *Li, supra,* 13 Cal.3d 804, 826. Under that repudiated doctrine, a defendant in an action for negligence could not assert the plaintiff's self-directed negligence as a defense if the defendant had the final opportunity to avert the harm. Similarly, the majority makes comparative fault unavailable as a defense because the insurance company had the final opportunity to avert an excess verdict by accepting a reasonable settlement offer.

It is true, of course, that there would have been no excess verdict in the Wisconsin litigation had AES agreed to accept Hubert's settlement offer. But the same may be said of the other hypothetical situations just discussed. In the first situation, the plaintiff not wearing a seat belt would have suffered no injury had the defendant not driven carelessly. In the second situation, the plaintiff who carelessly drove off the roadway would have suffered no injury had the manufacturer not defectively designed the vehicle to easily overturn. But a defendant's ability to prevent all of the harm at issue by acting with proper care has not been considered a barrier to application of comparative fault in any other setting.

The purpose of comparative fault is to equitably distribute loss among the responsible parties in proportion to their respective fault. To achieve that end, the loss should be equitably distributed among all parties whose failure to use proper care was a legal cause of the harm, regardless of the effect of that conduct on the acts or omissions of other parties.

Because Kransco's misconduct in making the false and incomplete discovery responses increased the likelihood of a judgment in excess of policy limits, AES's knowledge of that misconduct may be relevant to an assessment of AES's fault in rejecting Hubert's settlement offer, but that knowledge in no way lessens or eliminates Kransco's own fault, nor does it prevent Kransco's litigation misconduct from being a legal cause of the huge verdicts that the Wisconsin jury ultimately returned. Having found that the loss Kransco suffered as a result of the Wisconsin litigation was in part self-inflicted by means of its litigation misconduct, the jury acted properly in requiring that Kransco share the financial burden of that loss in proportion to its comparative fault.

The majority's last line of reasoning for rejecting equitable apportionment under comparative fault on the facts shown here is its assertion that the record contains insufficient evidence to establish that Kransco's litigation misconduct, in submitting false interrogatory answers, was a legal or proximate cause of the Wisconsin verdicts in excess of AES's policy limits. The

majority asserts, specifically, that evidence of causation is insufficient because Stuart Schneck, Kransco's in-house counsel, did not testify in the Wisconsin litigation and because the Wisconsin jury may have relied entirely on Kransco's manufacture of the defective product, and not at all on its false interrogatory responses, when it made the $12.3 million award of compensatory and punitive damages. (Maj. opn., *ante*, at pp. 408-409.)

The standard of review for a jury's findings on causation issues in relation to comparative fault is substantial evidence. (*Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 476 [38 Cal.Rptr.2d 739].) Under that standard, a court starts by presuming that the record contains evidence to sustain every finding of fact, and its power begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, to support the finding. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) The majority fails to apply this deferential standard of review.

Although Schneck, who prepared and executed the false interrogatory responses for Kransco, did not testify in the Wisconsin litigation, it is undisputed that the Wisconsin jury heard evidence of the false responses. For purposes of applying the substantial evidence test, it makes no conceivable difference that the evidence did not consist of Schneck's testimony but instead the testimony of Steven Schneider, Kransco's vice-president in charge of the redesign and manufacture of the Slip 'N Slide, who knew that the interrogatory responses were false when made and who knew that, despite his sworn statement to the contrary, Schneck had not made a diligent inquiry among Kransco employees before executing the responses.

The record does not show with absolute certainty or precision the effect that evidence of the false interrogatory responses had on the excess judgment in the Wisconsin products liability action. But when a jury awards $12.3 million in damages, of which $10 million is punitive damages, on a claim that the plaintiff would have settled during trial for $750,000, it is reasonable to infer that something happened at trial to cause the jury to form a very low opinion of the defendant. Kransco's own experts conceded during the California bad faith trial that one of the worst things that can happen at any trial is for the jury to believe that a party has lied. This is especially true when the jury has the option of awarding punitive damages. The California jury in the bad faith action could reasonably conclude, based upon the evidence presented, that the Wisconsin judgment would have been substantially less, and perhaps within policy limits, had Kransco never submitted the false interrogatory responses. This causation determination is no more conjectural or speculative than the determinations juries routinely make in legal

malpractice actions in deciding whether counsel's errors or omissions injured the client by affecting a verdict in an earlier proceeding. (See *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 831-837 [60 Cal.Rptr.2d 780].)

### III

"[C]ourts cannot logically ground the duty of good faith and fair dealing in tort law and, at the same time, reject the concomitant and well-established affirmative defense of comparative fault. Fidelity to legal doctrine requires that if the implied duty of good faith and fair dealing merits tort remedies for its breach, so must it be subject to tort defenses." (Richmond, *The Two-way Street of Insurance Good Faith: Under Construction, But Not Yet Open, supra,* 28 Loy. U. Chi. L.J. 95, 140, fns. omitted.) When it abolished the all-or-nothing contributory negligence doctrine, this court said the decision was "to be viewed as a first step in what we deem to be a proper and just direction." (*Li, supra,* 13 Cal.3d 804, 826.) By refusing to recognize a partial defense of comparative fault in insurance bad faith actions based on unreasonable failure to settle with third parties, the majority takes a step backward, making liability insurers the only parties to whom this court has denied the benefits of California's comparative fault tort system.

Rather than perpetuate an all-or-nothing system in this one tort setting, I would take the next logical step in the proper and just direction of equitable apportionment by recognizing that the comparative fault system includes insurance bad faith tort litigation.

On July 26, 2000, the opinion was modified to read as printed above.