Filed 9/18/23  Perera v. Moine CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| LIONEL PERERA et al., as Trustees, etc., | B317395 |
| Plaintiffs, Cross-defendants and Appellants, | (Los Angeles County Super. Ct. No. 19STCV12537) |
| v. | |
| CHARLES A. MOINE, | |
| Defendant, Cross-complainant and Appellant. | |

APPEALS from a judgment of the Superior Court of Los Angeles County, Terry Green, Judge.  Reversed and remanded with directions.

Law Offices of Jeffrey B. Ellis and Jeffrey B. Ellis for Plaintiffs, Cross-defendants and Appellants.

Robert D. Feighner; Hitchcock Bowman & Schachter and Robert B. Schachter for Defendant, Cross-complainant and Appellant.

Charles A. Moine sold contaminated commercial property to Lionel and Nirmala Perera as Trustees of the Perera Family Trust.  Following a bench trial the court found Moine had breached his obligation under the parties' purchase agreement to provide regulatory approval in the form of a "No Further Action Letter" (NFA) regarding the contamination, but reduced the damages awarded to the Pereras (from approximately $1.12 million to approximately $750,000) based on its finding the Pereras had breached the implied covenant of good faith and fair dealing by failing to authorize payments from an account created by a separate holdback agreement and refusing to execute a deed restriction to expedite regulatory approvals.  The court also found in favor of Moine on his cross-complaint for a common count, further reducing the total award of damages through an offset.

On appeal Moine contends he did not breach the purchase agreement and, even if he did, the Pereras were not entitled to a judgment because of their own material failure of performance, breach of the implied covenant and failure to mitigate damages. In a cross-appeal the Pereras contend the trial court erred in finding they had breached the implied covenant of good faith and fair dealing and ruling in favor of Moine on his cross-complaint. We reverse the judgment, agreeing with the Pereras' positions in Moine's appeal and their cross-appeal, and remand for entry of a new judgment in favor of the Pereras on both their breach of contract action and Moine's cross-complaint that includes a new damage award consistent with our opinion.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Parties' Agreements*

  a. *The purchase agreement*

On November 17, 2006 Moine, Kathleen M. Kokawa-Moine and Daniel M. Moine as "Seller" and the Pereras as "Buyer" entered into an agreement to sell 3.27 acres of land in Compton, California for $6.65 million. It was undisputed that industrial operations under ownership prior to the Moines had resulted in contamination of the property. Paragraph 12.2 of the purchase agreement provided, "Buyer hereby acknowledges that, except as otherwise stated in this Agreement, Buyer is purchasing the Property in its existing condition and will, by the time called for herein, make or have waived all inspections of the Property Buyer believes are necessary to protect its own interest in, and its contemplated use of, the Property. The Parties acknowledge that, except as otherwise stated in this Agreement, no representations, inducements, promises, agreements, assurances, oral or written, concerning the Property, or any aspect of the occupational safety and health laws, Hazardous Substance laws, or any other act, ordinance or law, have been made by either Party or Brokers, or relied upon by either Party hereto."

Paragraph 12.4 of the purchase agreement provided in part, "Any environmental reports, soils reports, surveys, and other similar documents which were prepared by third party consultants and provided to Buyer by Seller or Seller's representatives, have been delivered as an accommodation to Buyer and without any representation or warranty as to the

sufficiency, accuracy, completeness, and/or validity of said documents, all of which Buyer relies on at its own risk."

Paragraph 26(d) of the purchase agreement—central to the instant litigation—provided, "Seller shall continue to monitor the groundwater until Seller provides a No Further Action Letter from the County of Los Angeles."[1]

b. *The holdback agreement*

On March 20, 2007, a month prior to the close of escrow, the Pereras as "Buyer," the Moines as "Seller," CDC Small Business Finance as "Lender" and Exchange Resources, Inc. as "Holder" executed a holdback agreement. The agreement provided as part of the recitals, "After the close of escrow, ground water sampling *and any related environmental work necessary for the issuance of a 'No Further Action Letter'* will be required by the Lender as part of the SBA[2] environmental clearance requirements. The estimated cost of these samplings, *and any remediation work required,* is Fifty-four thousand dollars ($54,000). The SBA requires that 110% of the estimated cost be deposited and held for the testing. The parties agree that Seller will deposit into this Holdback Account funds totaling Sixty thousand dollars and 00/100 ($60,000) to be held for payment of the semi-annual testing." (Original italics.)

---

[1]    The purchase agreement also contained an integration clause (paragraph 17) providing, "This Agreement supersedes any and all prior agreements between Seller and Buyer regarding the Property," and specifying, "Amendments to this Agreement are effective only if made in writing and executed by Buyer and Seller."

[2]    The SBA refers to the Small Business Administration.

The agreement then provided, "The Parties agree that Holder will disburse the funds held as follows: [¶] Seller, Buyer and/or Lender will deliver to Holder a copy of the Invoice for ground water sampling.  Upon receipt of the Invoice, Holder will issue an instruction authorizing payment of the Invoice.  Lender will advise Holder when all Invoices have been delivered.  Holder will issue a final instruction authorizing the release of the balance of funds to Seller. [¶] Funds will be placed in an Interest Bearing Account with Union Bank of California.  Interest to accrue for the benefit of Seller, so long as a W-9 is deposited with Holder at the time the account is opened."  In bold typeface and all capital letters, the agreement provided, "Parties acknowledge that Holder will not release any funds without mutually approved instructions."[3]

### 2. *Moine's January 25, 2019 Letter*

On January 25, 2019 Moine's attorney sent a letter to the Pereras' counsel stating Moine would not be submitting any additional documents regarding the property to any governmental agency.  It was undisputed that no NFA was issued.  The Pereras initiated this lawsuit three months later.

### 3. *The Operative Pleadings*

In their operative first amended complaint the Pereras alleged the prior owners of the Compton property conducted soil sampling in the mid-to-late 1990's that detected concentrations of trichloroethylene (TCE).  The investigation of contamination at the property came under regulatory oversight by the Los Angeles

---

[3]    The holdback agreement provided Exchange Resources would be paid as "Holder" an annual fee of $500 "to be paid by Seller."

Regional Water Quality Control Board. Moine purchased the property in 2003, and the Board designated him the sole party responsible for the contamination.

The Pereras further alleged they agreed with Moine to purchase the property for $6.65 million (attaching the November 17, 2006 purchase agreement as an exhibit) and Moine, in turn, agreed to provide an NFA from the regulator regarding the contamination. From 2006 to 2021, however, Moine failed to obtain an NFA. On January 25, 2019 Moine's attorney notified the Pereras' attorney that Moine would not be submitting any additional documents to any governmental agency. The Pereras alleged they had incurred damages as a result of Moine's breach.

In his cross-complaint for a common count against the Pereras, Moine alleged, although he had approved the release of holdback agreement funds to pay expenses, the Pereras failed to authorize, or delayed in authorizing, release. The Pereras' breach of the holdback agreement, Moine averred, damaged him.

4. *The Trial, Statement of Decision and Judgment*

At the bench trial, which commenced on August 2, 2021, multiple witnesses testified over the course of several days. The purchase agreement, the holdback agreement and the January 25, 2019 letter were admitted into evidence; and the parties stipulated, "Under Paragraph 26(d) of the Purchase Agreement, Moine agreed to 'provide[ ] a No Further Action Letter from the County of Los Angeles' for the Property."

6

The trial court issued a statement of decision[4] on August 16, 2021. The court found that Moine, in selling the property, promised to obtain a letter from the Board absolving the Pereras of responsibility for cleaning up the TCE. Although there were full disclosures of the contamination of the property and the property was sold "as is," paragraph 26(d) of the purchase agreement required Moine to "continue to monitor . . . the groundwater until [S]eller provides [an NFA] from the [C]ounty of Los Angeles." Quoting excerpts of the holdback agreement, the court stated it "extended [Moine's] obligations beyond the completion of payment."

The court further found that in January and March 2007 the parties had expected an NFA from the Board would be forthcoming. As the court explained, there were two components to obtaining an NFA: "soil closure" and "groundwater closure." The property had been under the Board's review for years with only regular groundwater monitoring required. "Several times during the period 2008 to 2015 the Board seemed ready to issue [an NFA] with respect to soil," with the "only conditions precedent to issuance [being] a deed restriction—that the property would not later become residential—and payment of outstanding fees." Although the property was zoned for commercial use and there was no evidence the Pereras ever intended any other use, the Pereras refused to sign the deed restriction and also refused to timely authorize payments to the Board from the holdback account. As a result, a soil closure letter was never issued.

---

[4] We omit unnecessary capitalization of letters in any document quoted in this opinion.

The groundwater had been monitored for several years. From 2001 to 2020 monitoring showed a steady decline in contaminants. It was Moine's position this was due to natural processes that should be allowed to continue. The Board, however, starting around 2014, became convinced more proactive remediation was required. On January 25, 2019 Moine abandoned efforts to obtain the NFA, and it then became the Pereras' burden, as a "co-responsible party," to satisfy the Board. The Pereras claimed to have paid $209,448 for environmental consultants and board oversight fees. The NFA contemplated by the purchase agreement was never issued.

The court's rulings included: (1) Paragraph 26 of the purchase agreement imposed an obligation on Moine to furnish the Pereras an NFA for the property, and Moine's obligation was unconditional; (2) no NFA had been issued by the Board, which decides when issuance of the NFA is warranted; (3) the January 25, 2019 letter reflected an anticipatory breach by Moine of the purchase agreement; (4) the Pereras unreasonably refused to sign the deed restriction; (5) the holdback agreement contemplated that funds be spent on groundwater sampling and any related environmental work necessary for the issuance of an NFA; (6) the Pereras unreasonably refused to authorize payments of funds from the holdback agreement; (7) the Pereras' refusal to sign the deed restriction and/or refusal to authorize funds to reimburse the Board prevented the issuance of the soil closure letter; (8) issuance of the soil closure letter would not have necessarily led to the issuance of a groundwater closure letter and the NFA for the property; (9) the Pereras' refusal to sign the deed restriction and/or authorize the transfer of funds constituted a breach of the implied covenant of good faith and fair

8

dealing, but only excused Moine's performance of the obligation to obtain a soil closure letter and did not excuse Moine from performing his obligation to obtain the other component of an NFA for the property, a groundwater closure letter; and (10) obtaining a soil closure would constitute 33 percent of the potential costs of cleanup.

Turning to the allegation the Pereras had breached the implied covenant of good faith, the court concluded the Pereras' breach by failing to authorize payment of fees and/or by their refusal to sign the deed restriction was material and Moine's obligation to obtain soil closure was dependent on the Pereras' cooperation. Accordingly, the Pereras' breach excused Moine from his obligation to obtain soil closure. Because Moine's obligations with regard to groundwater remediation were independent of that breach, however, Moine remained liable for his failure to provide groundwater remediation. The Pereras' damages, the court ruled, were limited to amounts necessary for that portion of any future remediation efforts.

Determining the damage award—the amount it would cost to satisfy the Board and obtain the NFA—the court rejected the Pereras' proposed figure of $4.1 million based on their expert Frank Edward Reynolds, Jr.'s opinion and adopted Moine's estimate of $911,000 based on his environmental consultant Mark Leymaster's calculations. In addition to that sum, the court included as damages $209,448 for payments by the Pereras to environmental consultants and the Board. However, because the court found the Pereras could not recover one-third of their damages due to their breach of the implied covenant related to soil closure, the court found the Pereras were entitled to total damages of $750,700.16. Under the subheading "The Cross-

9

complaint," the court, without any explanation specific to that subheading, found for Moine and assessed damages at $61,000.

The court entered its judgment on October 26, 2021 awarding the Pereras as plaintiffs damages of $750,700.16 plus prejudgment interest, attorney fees and costs, and awarding Moine as cross-complainant $61,000 as an "[o]ffset of Plaintiffs' damages." Moine filed a timely notice of appeal of the judgment, and the Pereras filed a timely notice of cross-appeal.

## DISCUSSION

1. *The Trial Court Did Not Err in Concluding Moine Committed Anticipatory Breach of Contract*

   a. *Governing law and standard of review*

"'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.]' [Citation.] In determining this intent, '[t]he rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it.'" (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 288; accord, *Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal.App.5th 56, 69 ["[w]e ascertain "'the intent and scope of [an] agreement by focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made"'"].)

When no ambiguity is asserted or there is no conflicting extrinsic evidence concerning the meaning of a purported ambiguity in a contract, interpretation of the contract is a legal determination subject to de novo review. (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 393-395; see *Hanna v. Mercedes-Benz USA, LLC (*2019) 36 Cal.App.5th

10

493, 507 ["in the absence of any conflict in extrinsic evidence presented to clarify an ambiguity," written agreements are interpreted de novo].) "'It is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence, even when conflicting inferences may be drawn from uncontroverted evidence.'" (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 527; accord, *Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 915.) But where "the facts to which a contract provision must be applied are disputed or require the weighing of evidence, the application of that provision presents a question of fact," and our review is for substantial evidence. (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 391, fn. 15.)

b. *The Trial Court Did Not Err in Concluding the January 25, 2019 Letter Reflected Moine's Anticipatory Breach of the Purchase Agreement*

Moine contends the trial court erred in finding he anticipatorily breached the purchase agreement on January 25, 2019 for three reasons. First, the Pereras purchased the property "as is" and Moine continually monitored the groundwater as required. Second, the holdback agreement provided a $60,000 ceiling for the cost of monitoring. Third, evidence of the parties' conduct demonstrated they did not contemplate remediation would be required. None of Moine's arguments has merit.

With respect to Moine's primary contention, the purchase agreement did provide the Pereras were acquiring the property "in its existing condition." However, paragraph 12.2's as-is provision is expressly limited by the additional language "except as otherwise stated" in the parties' agreement. As discussed, paragraph 26(d) required Moine to continue monitoring the

11

groundwater until he provided an NFA, a dual obligation recognized by the parties in their trial stipulation, which acknowledged Moine had agreed to provide an NFA from the County. Moine's attempt to negate that second aspect of his contractual promise by referring to extrinsic evidence purportedly demonstrating the agreement required only monitoring, not an NFA, is groundless in light of the plain, unambiguous language of paragraph 26(d), fortified by the parties' stipulation. (See *People v. Farwell* (2018) 5 Cal.5th 295, 300 ["Farwell's stipulation conclusively established the stipulated facts as true"].)

As the trial court found, the January 25, 2019 letter, in which Moine's attorney stated Moine would not be submitting any additional documents to any governmental agency, constituted an anticipatory breach of Moine's obligation to provide an NFA. The inescapable import of the January 25, 2019 letter was that Moine had abandoned any effort to obtain an NFA from the Board and did not intend to pursue obtaining an NFA after that date.

With regard to the contention that responsibility for the cost of monitoring was limited to $60,000 and that this limitation precluded the court from finding a breach of contract when Moine ceased efforts to obtain an NFA, Moine does not contend the purchase agreement contains any such limitation. Rather, Moine argues the holdback agreement should be considered an amendment to, or extension of, the purchase agreement and the holdback agreement shows the parties anticipated the cost of all monitoring or other environmental clearance requirements would not exceed $60,000.

The holdback agreement did state the estimated cost of groundwater sampling and any required remediation work was

$54,000 and explained the SBA required 110 percent of the estimated cost to be deposited for the testing. However, the holdback agreement did not purport to condition Moine's obligation under the purchase agreement to monitor and provide an NFA on the cost of doing so not exceeding $60,000, an amount the holdback agreement indicated was calculated to satisfy the SBA requirement.[5]

Moine's contention the parties' conduct shows they did not, at the time they entered into the purchase agreement, contemplate remediation would be required does not support, let alone compel, a contrary result. Moine relies on testimony indicating the parties were not aware until 2014 or 2015 that the Board would actually require remediation. However, nothing in the record suggests the parties communicated before the property's sale their subjective beliefs as to whether Moine's obligations would include any remediation necessary to obtain an

---

[5] Moine's testimony that he believed his exposure was limited to $60,000 was contradicted by the testimony he gave at trial: Asked whether, at the time the $60,000 figure was developed, Moine had any expectation that semi-annual testing would exceed $60,000, he responded, "Well, we were prepared to go over. . . . [T]hese are based on estimation [*sic*] projections, so I thought it was realistic, a little more or a little less, but I thought it was a reasonable estimate." Significantly, Moine points to no evidence he expressed to the Pereras before sale of the property any belief his obligations to provide monitoring and an NFA were conditioned on a $60,000 cost limitation. Even if Moine had such a subjective belief, it is not relevant to our interpretation of the parties' agreements. (See *Zissler v. Saville* (2018) 29 Cal.App.5th 630, 644 [the parties' undisclosed intent or understanding is irrelevant to contract interpretation]; *Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 8 [same].)

13

NFA.[6] (See *Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 579 ["'mutual consent is gathered from the reasonable meaning of the words and acts of the parties, and not from their unexpressed intentions or understanding'"]; *Zissler v. Saville* (2018) 29 Cal.App.5th 630, 644 [same]; *Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 8 ["'California recognizes the objective theory of contracts [citation], under which "[i]t is the objective intent as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation"'"; "'[t]he parties' undisclosed intent or understanding is irrelevant to contract interpretation'"].)

As discussed, the parties stipulated that under paragraph 26(d) Moine agreed to provide an NFA; and it was undisputed no NFA had been issued. The most reasonable interpretation of that agreement is that Moine also agreed to do what would be necessary to provide the NFA, including any remediation work the Board required. The trial court did not err in concluding Moine anticipatorily breached the purchase agreement when he abandoned his efforts to provide an NFA.

---

[6] Moine on appeal relies in part on his testimony answering "No" to the questions, "At any time before close of escrow, did you indicate to Mr. Perera that you would do remediation work on the site," and, "Did you indicate to him that you would do any cleanup on the site?" That testimony, however, does not establish that Moine had communicated to the Pereras that he would not do remediation work or cleanup on the site. Indeed, Perera testified he did not have any discussions with Moine about the condition of the property before the close of escrow, nor had any environmental issues been discussed with Moine.

14

2. *The Trial Court Erred in Concluding the Pereras Breached an Implied Covenant To Sign the Deed Restriction*[7]

a. *Additional background*

In a September 5, 2008 letter to Moine (trial exhibit 21), the Board indicated a soil closure restricted to commercial/industrial land use "could be considered." The letter stated, "Upon completion, submittal and concurrence of [a 'Certification Declaration for Compliance with Fee Title Holder Notification Requirements' and a 'Covenant and Environmental Restriction on Property'] from this Regional Board, a soil closure will be granted." The letter continued, "If an unrestricted soil closure is preferred a human health risk assessment must be completed and submitted to this Regional Board. If the results from this health risk assessment indicate that soil contamination remaining at the site does not pose a significant risk for human health under the unrestricted land use scenario, a[n] unrestricted soil closure will be considered."

Trial exhibit 39, acknowledged by Moine's counsel to be the deed restriction at issue, was a form titled "Covenant and Environmental Restriction on Property." The form provided it "sets forth protective provisions, covenants, conditions and restrictions (collectively referred to as 'Restrictions') upon and

---

[7] "It has long been recognized in California that '[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'" (*Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 400.) "A breach of the implied covenant of good faith is a breach of the contract." (*Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230, 1244.)

15

subject to which the Burdened Property and every portion thereof shall be improved, held, used, occupied, leased, sold, hypothecated, encumbered and/or conveyed" (section 1.1); the Restrictions would run with the land (section 1.1); the owners executing the form "covenant[ ] that the Restrictions shall be incorporated in and attached to each and all deeds and leases of all or any portion of the Burdened Property" (section 1.3); recordation of the form "shall be deemed binding on all successors, assigns, and lessees, regardless of whether a copy of [the form] has been attached to or incorporated into any given deed or lease" (section 1.3); the purpose of the form was to "convey to the Board real property rights, which will run with the land" (section 1.4); and the form was to be recorded within 10 days of execution (section 5.4).  Among other limitations it required development and use of the burdened property to be restricted to industrial, commercial or office space—with no residence for human habitation, hospitals, schools for minors or day care centers for senior citizens or for children being permitted on the burdened property (section 3.1).

On April 6, 2010 Leymaster, whose services for Moine included performing the property's groundwater monitoring, wrote Moine (trial exhibit 30) stating his understanding that the Board had indicated a soil closure letter could be issued for commercial/industrial use, with a closure letter likely within one to two months if the current property owner executed "the deed restriction for commercial/industrial use only."  In his letter Leymaster also stated a soil closure for unrestricted use would take longer, with a health risk assessment to be sent for review and additional work that "could push the final closure letter out to 12 months for unrestricted use."  Leymaster testified that, had

Lionel Perera signed a deed restriction, Leymaster had no doubt soil closure would have been obtained, but, because Perera did not want the restriction, efforts to obtain soil closure for residential standards were instead made, with a human health risk evaluation submitted shortly after April 2010. Those efforts were successful, and the Board indicated it would grant the soil closure on the condition its bills were paid.[8]

As shown in a string of emails admitted in evidence, on September 28, 2012 a Board representative notified Leymaster the Board's invoices needed to be paid before issuance of the soil closure letter. After a further exchange of emails about the Board's outstanding invoices, the Board representative on November 15, 2013 told Leymaster as soon as the invoices were paid the soil closure letter was ready to be issued. Leymaster forwarded the email string to Moine. On November 26, 2013 Moine sent an email to real estate broker David Denitz, who had been involved in the sale of the property, stating Perera needed to approve payment of the Board's invoices from the holdback account before the Board would mail the closure letter. Perera testified that he had seen the November 26, 2013 email and Denitz told him he needed to approve payment of the Board's invoices.

In the meanwhile, on October 2, 2012 the Board notified Perera it intended to issue a soil closure, with no mention of any requirement for a deed restriction or payment of Board fees for its issuance. On May 21, 2015 Moine sent an email to Denitz

---

[8]     In a July 20, 2010 letter the Board informed Moine it was permitted under the law to recover its reasonable expenses for certain regulatory work.

17

stating the Board had approved soil closure, pending the payment of fees due, more than two and one-half years earlier.

Denitz testified there was a time when the Board had been ready to issue a soil closure if Perera had signed a deed restriction. Perera testified the property had never been used for residential purposes and he had no intention at the time he bought it to use it for residential purposes; but he was reluctant to agree to the deed restriction because of concern about its impact on his ability to sell the property in the future.

In finding a breach of the implied covenant, the trial court stated, "While it is true that signing a deed waiver was not an affirmative term of [the purchase agreement], there was never any need for such a term. There was never any expectation that the site be used for residential dwellings. The property is and was zoned for commercial use only, and it was always intended by the parties for commercial purposes. In failing to sign the deed waiver, [the Pereras] neither gained nor gave up anything, and given the state of the evidence at the time the waiver was sought, Plaintiff's signature would have resulted in the issuance of the soil closure letter."

b. *An implied covenant to sign the deed restriction conflicts with the purchase agreement's express provisions and purpose*

The trial court reduced the damages awarded the Pereras by one-third—from $1,120,448 to $750,700—based on its finding that they had breached the implied covenant of good faith and fair dealing by refusing to sign the deed restriction prohibiting residential use of the property or refusing to authorize payments from the holdback account (or both). Challenging the first ground, the Pereras essentially argue the obligation the court

18

identified as encompassed by the implied covenant contradicts the express provisions and purpose of the purchase agreement, which provided for delivery of a general warranty deed conveying fee title.[9]

As the Pereras emphasize, the purchase agreement did not indicate the fee title conveyed would be subject to any conditions or restrictions, including any use restrictions. To the contrary, paragraph 12, provided "Seller hereby makes the following warranties and representations to Buyer and Brokers. [¶] . . . [¶] . . . Seller has no knowledge of any actions, suits or proceedings pending or threatened before any commission, board, bureau, agency, arbitrator, court or tribunal that would affect the Property or the right to occupy or utilize same." Thus, interpreting the implied covenant to include an obligation to sign the deed restriction reflected in trial exhibit 39 would be inconsistent with express provisions of the purchase agreement regarding the property rights conveyed even if the Pereras never intended to develop the property for residential use, and even assuming the property was currently zoned for commercial/industrial use and a deed restriction would not have decreased the Property's value. (See, e.g., *Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 400 ["[t]he scope of the duty of good faith and fair dealing depends upon the purposes of the particular contract because the covenant 'is aimed at making effective the agreement's promises'"]; *Carma*

---

[9]     Paragraph 10.2(a) of the purchase agreement provided, "Seller shall deliver to Escrow Holder in time for delivery to Buyer at the Closing: [¶] (a) Grant or general warranty deed, duly executed and in recordable form, conveying fee title to the Property to Buyer."

*Developers (Cal.), Inc. v. Marathon Development California, Inc.*
(1992) 2 Cal.4th 342, 374 ["as a general matter, implied terms
should never be read to vary express terms"]; *Bevis v. Terrace
View Partners, LP* (2019) 33 Cal.App.5th 230, 252 ["[i]t is well
settled that 'an implied covenant of good faith and fair dealing
cannot contradict the express terms of a contract'"]; see also
*Foothill Properties v. Lyon/Copley Corona Associates* (1996)
46 Cal.App.4th 1542, 1551-1552 [implied covenant of good faith
and fair dealing "'requires neither party do anything which will
deprive the other of the benefits of the agreement'"].)

Moreover, although the trial court found the conditions
precedent to issuance of an NFA for soil included the deed
restriction, as discussed the trial exhibits relied upon by the court
actually showed soil closure could be granted for unrestricted use
through submission of a health risk assessment, albeit the
process to obtain soil closure for unrestricted use would likely
take longer.  There was thus insufficient evidence to support a
finding that signing of the deed restriction was necessary for soil
closure or that the failure of the Pereras to do so constituted a
breach of the implied covenant.[10]

---

[10]     Moine on appeal asserts the Pereras did not argue in the
trial court that he had the option to obtain soil closure without
any deed restriction.  Moine's counsel, however, advised the trial
court the requirement of a deed restriction was a "nonissue"
because Moine had submitted additional soil testing and the
Board agreed to issue closure with an unrestricted deed.  In
addition, Moine's counsel conceded the deed restriction was
unnecessary for soil closure, arguing that exhibit 21 "is the letter
in 2008 which says that [the Board] will issue a soil closure if
Mr. Perera—if the Pereras would sign a covenant or a deed

3. *The Trial Court Erred in Concluding the Pereras Breached the Implied Covenant By Failing To Authorize Release of Holdback Account Funds To Reimburse the Board*

The Pereras also contend the trial court erred in concluding their refusal to authorize the transfer of holdback account funds to reimburse Board expenses constituted a breach of the implied covenant of good faith and fair dealing excusing Moine's obligation to obtain a soil closure letter.[11] The holdback agreement, they assert, required only that they authorize the release of funds to pay for groundwater sampling (such as Leymaster's invoices for that work), not the Board's fees for its administrative and oversight costs. Moine, in response, argues the holdback agreement was established to pay for any environmental work necessary for issuance of an NFA, including the fees for the Board's regulatory work, and not simply groundwater sampling.

---

restriction. They went on to say, 'If you won't do that, then we need a health risk assessment,' which was done by Moine and Leymaster because they couldn't get Perera to do what he was supposed to do."

[11] The evidence established the Board delayed soil closure for failure to pay its fees, not Leymaster's expenses. Accordingly, although the Pereras may have withheld approval of the release of holdback account funds to pay Leymaster's invoices prior to 2015, the trial court's finding the Pereras breached the implied covenant was not based on any issue of payments to Leymaster. Moine does not dispute that characterization of the trial court's finding.

The Pereras' interpretation of the holdback agreement conforms more closely to the plain language of the contract.[12] To be sure, the agreement did, as Moine points out, state groundwater sampling and any related environmental work necessary for the issuance of an NFA would be required by the lender as part of the SBA environmental clearance requirements. But that language was part of the agreement's recitals, not its operative provisions. (See, e.g., *Sabetian v. Exxon Mobil Corp.* (2020) 57 Cal.App.5th 1054, 1069 ["'[t]he law has long distinguished between a "covenant" which creates legal rights and obligations, and a "mere recital"'"]; see also *O'Sullivan v. Griffith* (1908) 153 Cal. 502, 506 ["[a] covenant or warranty is never implied from a mere recital"].) Moreover, although in its recitals the agreement stated the estimated cost of samplings and any required remediation work was $54,000, the recitals continued by stating the "SBA requires that 110% of the estimated cost be deposited and held for the testing," with no mention that the funds be held for payment of any remediation or other environmental work.

In contrast, the substantive provisions of the parties' agreement (what the "parties agree[d]" to) unequivocally stated

_____

[12] The trial court interpreted the holdback agreement on the fee authorization issue without indicating it was resolving any conflicts in extrinsic evidence. We thus review the holdback agreement on the fee authorization issue de novo, "exercising our independent judgment in interpreting the clause[s] without giving any deference to the trial court's ruling." (*Campbell v. Scripps Bank* (2000) 78 Cal.App.4th 1328, 1336; accord, *Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 599; see *City of Hope National Medical Center v. Genentech, Inc.*, *supra*, 43 Cal.4th at p. 395.)

22

the holdback account funds would be held for payment of groundwater sampling or testing. There was no mention of payment for related, additional environmental work. Indeed, the only provision of the contract relating to any obligation of Moine and the Pereras to authorize the release of funds stated the "[p]arties acknowledge that Holder will not release any funds without mutually approved instructions," and the specific contractual provision setting forth what funds would be disbursed by "Holder," Exchange Resources, referred simply to the "[i]nvoice for ground water sampling."

Despite this clear language, a potential ambiguity was arguably created by the fact the recitals stated the amount of holdback account funds to be deposited was based on a percentage of the estimated cost of samplings and any remediation work. Extrinsic evidence in the record fully supports interpreting the agreement as ensuring only the payment of Leymaster's groundwater sampling work, not the cost of remediation or any other related environmental work, including the Board's fees.

Hyung Kim, an environmental consultant who worked for the lender, CDC Small Business Finance, in 2006 and 2007, testified he had been asked by CDC to estimate the groundwater monitoring cost. He had been aware Leymaster was conducting periodic groundwater monitoring and had reviewed a test copy of a groundwater monitoring report by Leymaster. Kim initially proposed to CDC a cost estimate of $70,000 for groundwater monitoring, which assumed a certain number of sampling events, but later revised that number to $54,000 by reducing the estimated rounds of sampling. Because the SBA required setting aside 110 percent of the estimated cost, Kim proposed the set

23

aside amount of $60,000.  His cost estimate was not based on any remedial action plan.[13]

Moine's effort to identify extrinsic evidence to support his (and the trial court's) interpretation of the holdback agreement is unavailing.  Moine relies in part on the parties' at times ambiguous testimony regarding their subjective understanding of the agreement's language without any evidence those subjective understandings had been expressed to the other party before execution of the agreement.  Similarly, while Moine points to evidence a person who was not a party to the agreement (Denitz) told Perera years after execution of the holdback agreement that Perera had to approve payment of the Board's invoices, Moine fails to explain how that evidence demonstrates the mutual intent of the contracting parties at the time of contract formation.

Finally, Moine relies on the fact Perera ultimately authorized payment of $22,025.99 in Board fees, as shown by trial exhibit 43, an April 22, 2015 letter to Moine from Perera referring to the Board's most recent bill.  In that letter Perera insisted, "It is my view that this payment should have been made by you as party responsible for payment long time ago.  It is also my view that if this payment was duly made, the 'no further action' letter respecting [the property] may by now have been received by us from the [Board]."  Then, after explaining his secured lender had refused his request for a new loan with a lower interest rate when it discovered the absence of the NFA, Perera stated, "In order that I would reduce any further financial

---

[13]    In the trial court the parties did not dispute Kim's testimony the $60,000 in holdback account funds was based on the estimated cost for groundwater sampling or testing and not for remediation.

24

loss to me I have therefore decided to authorize Exchange Resources Inc. to release the amount of $22,025.99." Nothing about Perera's decision to release funds as explained in that letter supports a finding that Perera intended at the time he entered into the holdback agreement that the holdback account funds were to be used to pay for the Board's fees.[14]

4. *The Trial Court Erred in Finding in Favor of Moine on His Cross-complaint*

Without explanation or elaboration the trial court found in favor of Moine on his cross-complaint and awarded him $61,000 as an offset to the Pereras' damages award. In his briefing in this court Moine explains that, in support of that $61,000 award, he had presented at trial invoices and requests for payment from the holdback account of Leymaster's fees and the Board's fees, as well as a summary showing he had paid out of his own pocket a total of $61,302.31 for fees after the close of escrow. Under the holdback agreement, according to Moine, the fees were to be paid

---

[14] Our determination the trial court erred in ruling the Pereras breached the implied covenant of good faith and fair dealing disposes of Moine's arguments premised on the trial court's conclusion. For example, in arguing the Pereras cannot recover any damages because of their material failure of performance, Moine contends the Pereras' breach of the implied covenant excused his own contractual performance. Similarly, Moine's contention the Pereras failed to mitigate damages (what he refers to as the avoidable consequences doctrine) is predicated on the same erroneous assumptions underlying his breach of implied covenant claim that the Pereras were required to sign a deed restriction and authorize the release of funds to pay Board fees.

from the $60,000 in the holdback account, but Perera refused to authorize payment at any time before April 23, 2015.

Urging us to reverse the judgment in favor of Moine on his cross-complaint, the Pereras argue that the $61,302.31 in payments for which Moine sought reimbursement were sums he paid to perform his own obligation to obtain an NFA under paragraph 26(d) of the purchase agreement and that Moine failed to establish any amount of the $60,000 in the holdback account had been released to pay for costs unrelated to obtaining an NFA. They also argue Moine failed to show anything more than $15,000 remained in the holdback account and, moreover, any balance that may remain is to be released to him. Although there was no evidence Moine had ever requested release of the remaining fund balance, the Pereras on appeal represent they would consent to that request.

We agree the trial court erred in finding in favor of Moine on his cross-complaint. Although Moine labeled his cause of action a common count, Moine's theory of liability was breach of contract: Moine alleged the existence of the holdback agreement under which the parties agreed to hold $60,000 for certain expenses; Moine approved the release of funds from the holdback agreement; the Pereras, failing or delaying in doing so, breached the agreement; and, as a result, Moine was damaged. (Compare *Marina Pacific Hotel and Suites, LLC v. Fireman's Fund Insurance Company* (2022) 81 Cal.App.5th 96, 108 ["'[t]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff"] with *Allen v. Powell* (1967) 248 Cal.App.2d 502, 510 ["[t]he essential allegations of a common

26

count 'are (1) the statement of indebtedness in a certain sum, (2) the consideration, i.e., goods sold, work done, etc., and (3) nonpayment'"].)[15]

Despite having the burden of proving his alleged damages (see, e.g., *Jeff Tracy, Inc. v. City of Pico Rivera* (2015) 240 Cal.App.4th 510, 519-520), Moine failed to establish he was injured by a breach of the holdback agreement. As discussed, the Pereras' refusal to authorize release of Board fees did not constitute a breach of that contract; and, as for Leymaster's fees, because it was Moine's obligation under the purchase agreement to provide groundwater monitoring and obtain an NFA, he was responsible for the costs to do so. Moine neither argues nor points to any evidence showing Leymaster's fees for which he sought reimbursement were unrelated to his obligation to provide groundwater monitoring and an NFA.

In addition, the cross-complaint did not allege any amount of the $60,000 held in the holdback account had been wrongfully diverted by the Pereras. On appeal Moine acknowledges his cross-complaint did not seek recovery of any amounts paid out of that account.

Finally, the holdback agreement provided that Exchange Resources would issue a final instruction authorizing the release

---

[15] Even if viewed as a common count, in arguing Moine's cross-complaint was to recoup payments made to perform his own obligation, the Pereras essentially contend, and we agree, Moine did not carry his burden of proving consideration to support a common count cause of action: Moine did not allege, much less prove, the $61,302.31 he sought was unrelated to groundwater monitoring and obtaining an NFA, which were, as we hold, Moine's obligation.

27

of any balance of funds to Moine. Moreover, as discussed, Moine explains his cross-complaint sought only those amounts he directly paid to Leymaster, not any amount that may remain in the holdback account, and the trial court's award of $61,000 exceeds any amount that could have remained in the $60,000 holdback account after any disbursements. In sum, Moine fails to show he suffered any damage from a breach by the Pereras of the holdback agreement as alleged in his cross-complaint.

Moine contends the Pereras forfeited by failing to raise in the trial court what he characterizes as their "windfall" argument—that is, their contention Moine by his cross-complaint improperly sought a double recovery by seeking as damages the payment for services he was already obligated to provide. In their closing brief in the trial court, however, the Pereras' arguments included that Moine was not entitled to recover $61,302.31, comprising entirely of sums paid to Leymaster for his work, because Leymaster's services constituted "a necessary component to obtain the contracted for No Further Action letter" and Moine, not the Pereras, was thus obligated to pay for those services. The Pereras thus adequately asserted in the trial court the crux of their "windfall" argument.[16]

---

[16] Moine's forfeiture argument also ignores that his cross-complaint was filed on August 13, 2021—after the parties had already rested on August 9, 2021 and just three days before the court issued its statement of decision on August 16, 2021.

## DISPOSITION

The judgment is reversed.  On remand the trial court is directed to vacate its finding in favor of Moine on his cross-complaint, including the $61,000 award to Moine, and to enter a new finding in favor of the Pereras on the cross-complaint.  The trial court is further directed to vacate its damage award of $750,700.16 in favor of the Pereras on their complaint and to enter a new damage award that does not include any reduction for the nonexistent breach of the implied covenant of good faith and fair dealing and that is otherwise consistent with this opinion.

The Pereras are to recover their costs on appeal.


PERLUSS, P. J.

We concur:



SEGAL, J.



FEUER, J.

29